## DUVAL'S HEIRS v. THE P. & M. BANK, ET AL.

1. What was said in Doe ex dem Duval's Heirs v. McLoskey, 1 Ala. R. N. S. 708, in respect to a sale under a decree of the orphans' court, is recognized and re-affirmed.

2. The interest of a mortgagor in lands may be sold under a decree of the orphans' court, upon the petition of his executor or administrator—Perkins' Ex'rs v. Winter's Admr'x, 7 Ala. Rep. 855, re-affirmed.

3. If the jurisdiction of the orphans' court attaches upon an application by an executor or administrator, to sell the real estate of his intestate, then the proceedings will not be *void;* and if voidable merely, they cannot be collaterally impeached. [Wyman, et al. v. Campbell, et al. 6 Porter's Rep. 219.]

4. It is competent for the orphans' court to set aside a sale of lands made by commissioners under its decree, any time before confirmation; and the failure of the orphans' court to confirm the report of the commissioners, and ordering a re-sale, will annul what has been done by the commissioners, and release the purchaser from his bid, in the same manner as if the court had so declared *in totidem verbis.*

5. A party bid off different parcels of land at a sale made by commissioners under a decree of the orphans' court, and moved to set aside the same; afterwards he accepted deeds for some of the land, and in respect to the remainder a resale was ordered: *Held,* thet the acceptance of the deed, was not a waiver of the motion, so as to make the second sale a nullity.

6. The suppression of depositions, which if admitted prove nothing material, is not an error which authorizes the reversal of the decree rendered in the cause.

7. Loose and general expressions contained in letters, written by a man to a woman with whom he had lived, and for whom he at the time of writing cherished sentiments of friendship and affection, are insufficient to establish a resulting trust against the positive denial of the answer, where the inference does not preponderate in favor of such a trust independently of the answer and letters.

8. A mortgagee in possession under the provisions of the mortgage for the purpose of collecting his debt by the reception of the rents and profits, may purchase the mortgaged premises at a sale under a decree of the orphans' court, upon the petition of the personal representative of the mortgagor, and a decree in such cases is not void, merely because the mortgagor has not the actual possession.

Writ of Error to the Court of Chancery sitting at Mobile.

Duval's Heirs v. The P. & M. Bank, et al.

The plaintiffs in error are Julius Chaudron, and Annette, his wife, late Annette Duval, Felix Chaudron, and ......, his wife, late ...... Duval, daughters of Daniel Duval, deceased, Philip Duval, William Duval, Theodore Duval, Geo. and Francis Duval, (the latter an infant under twenty-one years, by Julius Chaudron, his next friend,) all children and heirs of the deceased and his wife, Catherine, who has since died. These parties filed their bill in January, 1843, setting forth the death of Daniel D. about the 1st of April, A. D. 1824, and his seizin at that time of a certain tract of land, (particularly described,) situate in the city of Mobile, which he had previously purchased from Maria Machado Caro, the mother of his wife. At the time of this purchase Madame Caro was the widow and sole executrix of her deceased husband, Benito Caro, whose will had been duly admitted to probate, in the orphans' court of Mobile. This bill authorized Madame C. to sell and dispose of the lands of her testator for the benefit of his children—she herself being entitled to one half of the same, in virtue of the Spanish laws under which it was acquired.

In December, 1821, the complainant's father purchased the land in question, and received a conveyance therefor, executed by Madam C. and three of the testator's children—the other children, being five in number, assented to the sale and the execution of the deed, and received their portion of the purchase money. Afterwards they confirmed the sale, by executing an instrument in writing, under their hands and seals. The complainant's father, at the time of his purchase, paid to Madam C. one thousand dollars in money, and made his two promissory notes, each for two thousand dollars, payable to her in one and two years after date. To secure the payment of these notes, he executed a mortgage on the premises purchased, and at the time of his death a part of the debt was unpaid.

At the time of the death of D. Duval, the complainants, his children, were of tender years; shortly thereafter, their mother obtained letters of administration on his estate, as well as letters of guardianship of their [persons and [estate. It is averred that the property purchased by their father was worth as much as eight thousand dollars at the time he ac-

quired it—Madame C. and the others interested in the sale, consenting to sell it to him at a price so inadequate, because their mother was one of the heirs of Benito C.

After the purchase of D. Duval, he made some valuable improvements on the premises, so that at the time of his death they were renting for $2500 a year. In addition to this he left slaves and other personal property, worth about $6,000, all which came to the hands of his administratrix, and was free from debt. The complainants particularly state the condition of the land at the time of the purchase of their ancestor, and the character of the improvements made thereon, and alledge that in its improved state it was worth, when he died, $25,000.

Madame C. was entirely satisfied with the mortgage as a security, and was willing to hold it without any attempt to foreclose it, until the rents and profits would yield a sufficient sum to enable the administratrix to discharge it, after applying as much as was necessary for the maintenance of herself and family. But being desirous, if convenient, to realize a part of the money due on the mortgage, Philip McLoskey, professing to be the friend of the complainants and their mother, proposed to Madame C. to purchase the mortgage, and to extend to them the same lenity she intended. The proposition was accepted on the terms in which it was made, and upon no other would it have been entertained; and a deed was accordingly executed by Madam C. and all the children of her testator, which fully recognized and confirmed the sale and conveyance to D. Duval, and assigned the mortgage to McLoskey, as well as the notes it was intended to secure. The consideration given for this assignment was, $1,000 in cash, and three several notes for $1,000, payable in six, eighteen and thirty months; which notes were secured by a mortgage executed by the assignee on the lands embraced by the security assigned. Immediately after the consummation of this transaction, about June, 1825, the assignee entered according to the understanding of the parties into the possession of the mortgaged premises, has continued to occupy them ever since, and receive the rents and profits; and this without accounting to the complainants, or entering satisfaction of the

mortgage, although the rents for two years were sufficient to satisfy his disbursements.

McLoskey denies the validity of the purchase made by the ancestor of the complainants of Madam Caro, except as to the interest of the three heirs of Benito Caro who executed the deed; *pretends* that the deed executed to him by the other five heirs, invested him with a title to three-fifths of the premises: *and further pretends*, that he purchased all the interest of the complainants' ancestor at a sale made under the decree of the orphans' court of Mobile, rendered upon the petition of his administratrix, alledging the indebtedness of his estate, beyond the ability of the personal assets to pay. In respect to the former pretence, it is denied to be true, and alledged that McLoskey paid nothing more than the four thousand dollars, and obtained only an assignment of the notes and mortgage by which they were secured. As for the decree by the orphans' court, and consequent sale, it is insisted that they were *coram non judice*—procured by the fraud of McLoskey and his coadjutors, and therefore void. If a petition, such as is pretended, was ever filed by the administratrix, she was induced thus to proceed by the exercise of the undue influence of McLoskey—knowing at the same time that the intestate's estate was not indebted to any extent, except the debt secured by the mortgage of which he became the assignee: That the sale was ordered by him while the administratrix was detained by duress in Cuba, whither she had been fraudulently sent, in order that the property might be sacrificed; which purpose was effected by a purchase made by McLoskey, through his agent, John R. Elliott, for the sum of ten dollars. It is insisted that the pretended decree and sale, are void for the additional reason that McLoskey was in possession of the premises as a mortgagee, leaving only a mere equity in the heirs of the intestate, which cannot, by a statute of this State, be appropriated to the payment of debts, otherwise than by bill in equity.

McLoskey further pretends that he has sold or disposed of all, or a part of the premises in question to different persons in separate parcels, to wit: to Charles Cullum, the Bank of Mobile, the Planters' and Merchants' Bank of Mobile, Wm. Crothers, and James and George Brown—all of whom it is

prayed may be made defendants to the bill. Complainants charge that these defendants, if they have made the purchases pretended, were informed at the time of their just claim and title, and that they were acquiring the premises in fraud of the same.

The defendants further pretend, that the complainants are barred of all relief, because they have heretofore instituted and dismissed a suit in equity for the same cause as the present. The truth in respect to this pretence is this, the complainants brought an ejectment, as well as a bill in equity for the recovery of the premises in question, in the circuit court of Mobile, which were considered by that court to be for the same identical cause, and they were ordered to elect which they would prosecute, and dismiss the other: thereupon they elected to proceed at law, and the bill was dismissed. The ejectment was tried at a term of the court which commenced in November 1842, and a verdict returned for McLoskey, the defendant in that action, on the ground that he had the legal title—the complainants having nothing more than an equitable right. An inspection of the records in these cases will show, that they were pending at the time McLoskey's co-defendants purchased of him, and consequently they are chargeable with a knowledge of the complainant's title.

The complainants insist, that upon taking an account, neither McLoskey nor his vendees are entitled to be paid for improvements that he or they have made on the premises. The bill prays that McLoskey may come to an account, and if, upon accounting, he may be found in arrear to complainants, above what may be required to reimburse himself, all legal expenditures in the purchase of the mortgage, &c. that he may be adjudged to pay such balance to them: *Further*, that he and his co-defendants may be required to bring into court, to be delivered up to be cancelled, all deeds, securities, mortgages, or other writing whatsoever, in relation to the premises in question, which have been made between themselves, and may in any manner incumber, embarrass, or affect the complainants' title: and upon the mortgage being satisfied, that they may be put in possession, &c.; and such other and further relief be granted may be as appropriate to the case, &c.

At the first term of the court of chancery, an entry was made, stating that "by consent of parties, the defendants are allowed sixty days to answer, and the cause is continued." A few days after the expiration of the time designated, on motion of the complainants, an order was made by the register that the bill be taken "as confessed against the defendants, the Planters' and Merchants' Bank of Mobile, William Crothers, Charles Cullum, and the Bank of Mobile, for want of answers; and complainants have leave to amend their bill by making James Brown and George Brown parties defendant."

A few days after the last order, and the amendment of the bill, an order of publication was made as to the Browns, who, it was shown by affidavit, were non-residents, and afterwards, upon proof of publication, the bill was taken as confessed as to them.

In the record, there is a demurrer interposed, at the instance of all the defendants, but the Browns, dated previous to the order by which time was given to answer, and leave granted to amend the bill.

All the defendants answered the bill at length, with the exception of Wm. Crothers, and as to them the order *pro confesso* was set aside. McLoskey, in his answer, admits the death of Daniel Duval, about the time alledged in the bill, and that the complainants are his heirs; that Catherine Duval, the widow, and complainants' mother, administered on his estate; that the intestate purchased of Maria Machado Caro, the mother of Mrs. Duval, and widow and sole executrix of the will of her deceased husband, Beneto Caro, the land described in the bill, about the time stated, for the sum $5000, one-fifth of which was paid in cash, and for the remainder in two equal annual payments of $2000, each, he made his several promissory notes. Both these notes were past due, at the time of the intestate's death, and were unpaid.

The intestate received a conveyance for the premises from Madam Caro, and three of the heirs of her deceased husband; the other five did not unite in its execution, and at the same time he executed a mortgage upon them for the security of

81

the payment of the notes. Respondent denies that Madam
Caro was willing to extend to the intestate, or his adminis-
tratrix, the indulgence which the complainants alledge, and
as proof thereof, avers that the notes and mortgage were plac-
ed in the hands of a lawyer of Mobile, for the purpose of
foreclosing the same, previous to the purchase by him of the
interest of the Caros.

Respondent affirms that he did not purchase the equity of
redemption of the Caros, with an understanding, or promise,
that he was purchasing with a view of assisting either Madam
Caro or her children, or the administratrix of the intestate, or
the complainants. But he acted upon his own account, paid
the balance of purchase money due the intestate's estate, and
in addition thereto paid $900, the sum at which the premises
were sold under a decree of foreclosure, upon a mortgage ex-
ecuted in 1822, to Jonathan Hunt, and $600 to Philip Caro,
one of the heirs of Beneto Caro, nine years after the purchase
of the equity of redemption, to induce him, upon attaining
his majority, to relinquish all claim to the property. These
several sums, it is insisted, were quite as much as the pre-
mises were worth, and their full market value at the time the
transactions took place; if they have since advanced greatly,
it has been caused by a large expenditure of money and la-
bor, and an extension of the business of Mobile. Respond-
ent's purchase was consummated by an assignment of the
notes and mortgage executed, and a conveyance by Madam
Caro, and all the heirs of her deceased husband, of all their
interest in the premises.

Respondent also insists upon his purchase under the decree
of the orphans' court of Mobile, as investing him with all the
title the intestate ever had to the premises in question, if the
other sources of title already stated, did not have that effect.
That the petition was not filed by the administratrix of the
intestate in consequence of the fraud of the respondent or his
coadjutors, nor was it induced in consequence of any undue
influence exercised by him ; that the decree was not obtain-
ed by any fraud of his, nor was the purchase or proceeeding
at his instance, prompted by any other than fair and honest
motives and acts. *Further*, the report of the commissioners
at which the premises were first bid off for him, was never

confirmed by the orphans' court; but the second sale was regularly made under an order for that purpose, and John R. Elliott purchased for him, at the sum alledged, subject to his liens. He denies that he purchased with the funds of the intestate's estate, or of the administratrix, or with money provided by any one but himself; or that he has been reimbursed the amount which the premises have cost him. He affirms that he has expended large sums of money for the benfit of the administratrix, and in the maintenance and education of her children, and it was his intention at one time to have done more for them, and other children of the administratrix, the paternity of which he acknowledges. This he hoped to have been able to do from the improvement and increased value of the premises; but his embarrassment and paramount obligation to creditors, placed it beyond his power to carry out his intentions. The respondent denies other allegations of the bill, enters minutely into a vindication of himself, from the imputations which it makes against his integrity, affirms that he paid a fair equivalent for the property, and declares that if any one had bid more, they should have had it.

The other defendants are derivative purchasers, or mortgagees from McLoskey; affirm, either that they had purchased and paid for their respective parts before they were informed of the claim of the complainants, or that they had, previous to such notice, discharged some responsible surety or indorser of the debt or debts intended to be secured by mortgage. These answers are drawn out at length, stating with particularity the parts purchased or mortgaged, the consideration, when and how due and payable, &c. All the defendants demur to the bill for want of equity, and rely upon the statute of frauds and perjuries.

At a term previous to the hearing of the cause, the defendants moved to suppress the complainants' depositions, on the ground that they were prematurely taken. And it appearing that the interrogatories were filed, and notice given to the defendants that commissions would issue to examine the witnesses before the defendants had answered, or the bill had been taken *pro confesso* as to all of them, the motion was accordingly granted.

The cause was heard upon the bill, answers in file, certain exhibits, exemplifications of records, and certain depositions offered by the defendants, &c. The chancellor was of opinion that the complainants had failed to make out their case, and that the title of McLoskey, under which the other defendants claimed, was *prima facie* valid, dismissed the bill at the complainants' cost.

A. F. HOPKINS and J. TEST, for the plaintiffs in error, insisted, that an equity of redemption could not be sold under a decree of the orphans' court, rendered upon the petition of the mortgagor's personal representative, alledging a deficiency of assets to pay debts. [Toul. Dig. 327; Clay's Dig. 350; 5 Porter's Rep. 182; 1 Ala. Rep. 734; 2 Id. 314; 5 Id. 719; 7 Id. 118; 5 Wend. Rep. 617; 4 Kent's Com. 184, note C.; 1 Pet. Rep. 201; 13 Id. 294; 2 Johns. Rep. 125; 3 Stew. & P. Rep. 397.] Equitable interests can only be sold under the decree of a court of equity. [Aik. Dig. 173; Clay's D. 350; 1 Ala. Rep. 734; 5 Id. 719; 7 Id. 118.] The mortgagee can't purchase the mortgaged property so as to acquire a title, and if he purchase he will be treated as a trustee. [1 Mad. Ch. 512; 1 Brown's Ch. Rep. 198; 1 B. & Beat. Rep. 46; 2 Johns. Ch. Rep. 30, 34, 60, 104, 118, 252; 7 Id. 174.]

But if it is competent for the orphans court to adjudge the equity of redemption to be sold for the payment of debts of a deceased mortgagor, still the proceedings in the case at bar, are so fatally defective as to make the decree and consequent pleadings void *in toto*. Directing a notice to be served on one guardian *ad litem* of the infant heirs, when another had been previously appointed, and not removed, was irregular. Disregarding the sale first made and reported by the commissioners, and ordering another sale near· twelve months after the motion was made to set it aside, without notice to the parties interested, or regular continuances of the proceedings, was unauthorized, and the act void; this was done without an order declaring the first sale invalid. [Clay's Dig. 350; 7 Ala. Rep. 726; 8 Ib. 876.] McLoskey moved the orphans' court to set aside all the purchases made by him, but before his motion was definitely acted on, one of his pur-

chases was confirmed, and he accepted a conveyance. This was an abandonment of his motion, and the re-sale, for this, if no other reason, was void.

The dismissal of the complainant's first bill, under an election forced upon him by order of the circuit court, cannot operate as a bar to the present suit. At most, it was nothing more than a non-suit. [2 Mad. Ch. 359; 2 Stew. R. 515; 1 Ala. Rep. 748.]

McLoskey admits in his answer to the first bill, which is an exhibit in this case, that he held the premises in question as a tenant in common with the complainant, until after his purchases under the decree foreclosing Hunt's mortgage, and the order of the orphans' court. These sales were void, and consequently the interests of the complainants unimpaired. His purchase from the Caros made him merely the assignee of the mortgage, and he must be so treated. The conveyance of the fee, by the mortgagee, is void, and does not even authorize the grantee to foreclose. [2 Bla. Com. 356; 2 Johns. Ch. Rep. 101, 109, 110, 125, 154; 7 Id. 37, 174; 2 Cow. Rep. 195, 204, 230; 10 Paige's Rep. 490.]

A power of sale contained in a mortgage will not, when executed, foreclose the mortgagor of his equity of redemption; but to produce this effect there must be a decree upon a bill filed for that purpose; unless, as in New York, such a mode of foreclosure is provided for by statute. [7 Johns. Ch. Rep. 32, 35, 37, 38; 2 Id. 101, 109, 110, 125, 154; 4 H. & Munf. Rep. 101; 1 Rand. Rep. 306; 1 B. & Beat. Rep. 187; 1 Dana's Rep. 25; 9 Mass. Rep. 422; 3 H. & McH. Rep. 328; 9 Wheat. Rep. 489; 2 Bla. Com. 349, 354, 356, 357; 2 Eq. Dig. 311, §§ 16, 18, 19; 305, 306, §§ 11, 36; 313 §§ 34, 35, 36.]

Upon a bill to redeem, an interlocutory decree is rendered, that the mortgagee account before the master; but until it is ascertained that the mortgagor is entitled to redeem, and a reference ordered, proof need not be taken to prove the value of the rents and profits. [1 Mad. Ch. 532, 535; 10 Paige's Rep. 49; 4 Kent's Com. 166-7; 3 Atk. Rep. 517; 4 Ves. R. 480; 12 Id. 495; 2 Pick. Rep. 505; 5 Id. 259; 1 Johns. Ch. Rep. 385; 9 Wheat. Rep. 499; 7 Cranch's Rep. 218;

6 G. & Johns. 275 ; 2 Sumn. Rep. 118 ; 2 Younge & C. Rep. 117.]

One who purchases from a mortgagee, or assignee, does not acquire the legal title, and the mortgagor will be entitled to redeem against him, although he purchased and paid his money, without notice of the mortgage. The purchaser of a mere equity is bound to take notice of a prior equity ; and it is only the purchaser of the legal estate who pays the purchase money in ignorance of an outstanding equity, that the law protects. [7 Porter's Rep. 263, 271.]

The defendants who claim under McLoskey had constructive notice of the mortgage executed by Duval ; for it is not only registered, but is recited in the deeds executed by the Caros in favor of McLoskey, which was duly recorded. *Besides*, the records of the suit in chancery by Hunt, and of the proceedings of the orphans' court, were accessible to these defendants, and are recited in the deeds under which McLoskey deduces a title. The decrees in both which, were rendered, when the respective courts had no jurisdiction of the proceedings which had been instituted. He must then be regarded as the assignee of the mortgage subject to the equity of redemption, and those claiming under him stand in the same predicament. [4 Kent's Com. 174, 179 ; 9 Wheat. R. 499 ; Sug. on Vend. 718, 747 ; 13 Mart. Rep. 384 ; 3 Porter's Rep. 10 ; 5 Id. 230 ; 2 Pet. Dig. 257-8 ; 6 Cranch's R. 8 ; 9 Wheat. Rep. 738 ; 2 Cow. Rep. 195, 230 ; 2 Pow. on Mort. 549 ; 1 Johns. Ch. Rep. 298, 394 ; 2 Id. 158, 575 ; 5 Id. 54, 56 ; 6 Id. 417 ; 7 Id. 65 ; 20 John. Rep. 637, 644 ; 1 Ala. Rep. 165 ; 2 H. & Munf. Rep. 245 ; 1 Pet. Rep. 273 ; 4 H. & Munf. R. 6 ; 2 Mad. Ch. 656 ; 1 Mad. Rep. 89 ; 18 Ves. Rep. 290 ; 3 P. Wms. Rep. 257 ; 2 Pow. on Mort. 547, 8, 9, (a) ; 8 Cow. Rep. 382 ; 1 Johns. C. Rep. 394, 576 ; 2 Id. 30, 62, 104, 118, 252, 445 ; 5 Id. 497, 570 ; 7 Id. 174 ; 8 Johns. Rep. 374 ; 4 Kent's Com. 441.]

*Again :* the Caros were out of possession—in fact were ousted by the conveyance made by some of them to Duval, and could not have made a valid sale and deed to McLoskey. A conveyance by one or more joint tenants or tenants in common operates an ouster of all the others. [3 Johns. Cas. 101 ; 5 Johns. Rep. 489 ; 9 Id. 57 ; 19 Id. 166 ; 11 Id. 91 ;

13 Id. 118, 409, 488 ; 13 Sergt. & R. Rep. 356 ; 3 Ala. R. 472 ; Adams on Eject. 56, note 3—55, note 1 ; 3 Conn. Rep. 191 ; 10 Mass. Rep. 283, 468 ; 4 Mason's Rep. 326 ; 5 John. Ch. Rep. 570 ; 4 Mart. Rep. N. S. 415; 1 Pet. Dig. 457.]

It is allowable to file a second bill charging notice where the first was dismissed, if the fact of notice was not alledged, or the point examined to, in the previous suit. [Sugd. on Vend. 762 ; 1 Ch. Cases, 252 ; 1 B. & Beat. Rep. 171 ; 2 Ves. Rep. 516 ; 1 Ch. Rep. 32 ; 1 Johns. Ch. Rep. 406 ; 1 Porter's Rep. 392.] But the purchaser of an alledged equity must deny notice previous to the purchase and payment of the money, whether it be charged or not. [Sugd. on Vend. 761 ; 8 Cow. Rep. 374-5, 382 ; 7 Pet. Rep. 252 ; 10 Paige's Rep. 49, 490.]

The mortgagee or his assignee cannot show against a bill to redeem, that he has purchased the fee of a person in whom it was vested ; nor can the mortgagor be prejudiced by the failure of the mortgagee to have the mortgage recorded. A bill to redeem will lie any time within twenty years after the entry of the mortgagee. [4 Kent's Com. 162 ; 9 Wheat. R. 497 ; Coote on Mort. 542, *et post.*]

A mortgagee in possession, is chargeable with rents and profits, but cannot charge for new improvements—he will only be allowed for necessary repairs. [4 Kent's Com. 160, 166-7; 3 Atk. Rep. 517 ; 4 Ves. Rep. 480 ; 12 Id. 495 ; 1 Johns. Chan. Rep. 385 ; 5 Pick. Rep. 259 ; 2 Id. 505 ; 2 Younge & C. Rep. 117 ; 2 Sumn. Rep. 108 ; 6 G. & Johns. Rep. 275 ; 7 Cranch's Rep. 218 ; 9 Wheat. Rep. 499 ; Coote on Mort. 542, *et post.*]

A mortgagee in possession cannot purchase the mortgaged estate. [2 Cow. Rep. 324 ; 5 John. Ch. Rep. 570 ; 7 Id. 25, 40 ; 2 Id. 442.]

As McLoskey's co-defendants claim through him, his answer is evidence against them. [6 Cranch's Rep. 9 ; 9 Id. 153 ; 4 Com. Dig. 198, 203 ; 4 Hawks' Rep. 256 ; 2 Bibb's Rep. 470 ; 2 Wheat. Rep. 380 ; 9 Id. 735, 831.] The depositions were improperly suppressed, and it was not incumbent upon the complainants to offer them again at the hearing. If prematurely taken as to some of the defendants, they

were admissible against those as to whom decrees *pro confesso* had been entered.

G. N. STEWART, J. A. CAMPBELL, and S. G. FISHER, for the defendants.   The sale by the order of the orphans' court was sufficient to invest McLoskey with all the interest which Duval had at the time of his death.   That court took cognizance of the petition, and its jurisdiction was not ousted by any thing occurring subsequently.   It is enough that the action of the court was not *coram non judice*.   The statute authorizes the orphans' court to order the sale of the *real estate* of a deceased person where the personalty is insufficient to pay debts; and whether the title be a mere equity of redemption, or any other which courts of law or equity recognize, is immaterial.   It is *real estate*, and this is all that the act of the Legislature requires.   [11 Searg. & Rep. 422; 14 Id. 181; 1 Ala. Rep. N. S. 708; 7 Id. 71, 855; 8 Id. 99; 8 Cranch's Rep. 22; 6 Porter's Rep. 262.]

The report of the commissioners, stating that McLoskey had bid off the premises in question for $5000, *was never confirmed*; and the transcript in Duval's heirs v. McLoskey, 1 Ala. Rep. 708, was at fault in stating the confirmation of this report: consequently what was there said as to the effect of the subsequent action of the orphans' court, will not be considered as authoritative.

If McLoskey's title is defective, those who purchased from him without notice, and paid their money or gave up securities, are certainly entitled to protection, and cannot be ousted by those who claim a mere equity.   [2 Sugden on Vend. 295, *et seq.*; 2 Mason's Rep. 272; 10 Pet. Rep. 177; 6 Ala. R. 806-7.]   There is no evidence controverting the case made by the answers of the defendants.   The depositions were rightly suppressed, because all the defendants had not answered, nor had the bill been taken *pro confesso* as to all, when they were taken; [4 Paige's Rep. 121,] and they were not offered to be read at the hearing: consequently they can not be looked to, by this court.   [Huff. Ch. Pr. 458; 6 Eng. Cond. Ch. Rep. 193.]

The order of the orphans' court, directing a second sale, was within its legitimate powers.   It pertains to all courts to

control their proceedings. [1 Ala. Rep. 708; 2 H. & Gill's Rep. 346.] The entry of the mortgagee does not disseize the mortgagor, and reduce his title to a mere chose in action, nor is his possession adverse. Their respective relations arise from the contract, and they may assign, devise, &c. their interests. [1 Pow. on Mort. 157-8-9; 2 Rand. Rep. 93; 10 Leigh's Rep. 172; Hubback on Suc. 142.] But if the mortgagee's possession became adverse by his entry, yet a third person could not object that a conveyance was made by the mortgagor, or that there had been a judicial sale of the interest of him or his heirs, when he was out of possession. [4 Hill's Rep. 464; 5 Ib. 272.] A court of equity treats a mortgagee in possession as a mere tenant—holding the possession as a means of collecting his own debt—the freehold is in the mortgagor, and the mortgagee cannot dispute it. Judicial sales are not affected by the laws in respect to maintenance. [2 Wend. Rep. 204; 3 Dana's Rep. 338.]

The allegations of a fraud or trust are explicitly denied by McLoskey's answer, if admitted, the other defendants would not be affected by the answer; and even if proved, would not impair their titles. The mortgages under which they claim vested the legal title, and the release of the equity of redemption, or its foreclosure by judicial decree made that title complete. [2 Sug. Vend. 295; 2 Story's Eq. 715; 3 J. J. Marsh. Rep. 57.] As for the consideration of the mortgages, viz : extension of the day of payment and release of securities, it is clearly sufficient. [6 Ala. Rep. 639; 10 Paige's R. 170.] The *onus* of establishing a notice to the co-defendants of McLoskey, of the defectiveness of his title, rests upon the complainants—and this we have seen they have failed to do. [1 Russ. Ch. Rep. 485, 491; 3 Litt. R. 365; 6 Munf. Rep. 42; 6 Ala. Rep. 718.] The proof of notice by a *lis pendens* entirely fails; for the action at law was unsuccessfully prosecuted, and the suit in equity was dismissed; they are therefore unavailing. [1 Vern. Rep. 286; 2 Sug. on V. 326; 2 Dana's Rep. 406; 2 Rand. Rep. 93, 102, 103.] The suppressed depositions, if they could be looked to, do not establish the fact of notice, and even if it had been given after the mortgages executed, and money lent or securities dis-

82

charged, and previous to the release of the equity of redemption, it would not defeat the derivative purchasers. [1 Ala. Rep. N. S. 23.]

In respect to the proceedings in the orphans' court, it may be added that, that court in Mobile, by an act of the legislature passed in 1826, is always open.

COLLIER, C. J.—The action of ejectment, to which the pleadings refer, was brought by the lessee of the complainants against McLoskey, and involved to a great extent, the merits of the present controversy. [1 Ala. Rep. N. S. 708.] That cause was removed to this court by writ of error, and by the opinion here pronounced it was decided that the jurisdiction of the county court, under the first section of the act of 1822 attaches as soon as the court recognizes the petition of the administratrix; and its decree cannot be *collaterally* impeached (if the jurisdiction is shown,) by the omission to designate the heirs by name in the petition, or elsewhere in the record; or by the direction of the citation to the guardian instead of the heirs. *Further*, though the statute referred to requires the commissioners appointed to sell the lands of an intestate, to make a report to the court at the time designated in its order or decree, yet the requisition must be regarded as directory; and if the commissioners fail to make their report at the appointed time, it is competent for the court to take measures to compel them to make it, and upon its being made, to confirm it by a final decree. It was said that the record of a proceeding in the county court, at the instance of an administrator, to obtain a decree for the sale of the lands of an intestate, need not show that the cause was continued from term to term, up to its final disposition—its continuance will be intended if the reverse does not appear. And though it may not appear *in totidem verbis* from the decree of a county court, that it was rendered at a regular or adjourned term, if the contrary does not appear, it shall be taken to have been rendered in conformity to the statute. Also, that the county court may refuse to confirm the report of commissioners appointed under the act of 1822, to sell the lands of an intestate estate, but it is not competent for that court seven months after the confirmation of the report, to annul the final

decree and order a resale. And although the county court cannot decree the sale of the lands on which mortgages exist, and provide for their payment, from the proceeds, yet it is asked whether a sale of the mortgagor's interest under such a decree, will not confer upon the purchaser the right to redeem.

In Perkins' ex'r v. Winter's adm'x, 7 Ala. Rep. 855, the point was directly made, whether the statutes which provide for the sale of the real estate of deceased persons, do not authorize the orphans' court to take jurisdiction of the lands of a decedent, which are incumbered by a mortgage, or other security. We there said that, "A mortgagor in possession, has not only the equity of redemption, but he has a legal interest which may be sold under execution, and conceding that the orphans' court has no equitable jurisdiction, yet the statute cannot, by construction, be limited to cases in which the decedent had an unincumbered legal title. It is upon the *real estate* that, that court is authorized to act, without reference to the completeness of the title. A sale under its decree, places the purchaser in the condition of the heirs of the deceased, and any remedy which they might have adopted in order to disincumber the land is open for him. Perhaps his situation would be more favorable than their's, where he can be brought, within the influence of the rules applicable to a *bona fide* purchaser without notice." To the same effect is Evans' adm'r v. Matthews, 8 Ala. Rep. 99. See also, Wyman, et al. v. Campbell, et al. 6 Porter's Rep. 219.

It has been suggested at the bar, that these decisions are in conflict with the act of 1820, " concerning executions and sales by sheriffs and for other purposes." [Clay's Dig. 350, § 31; Id. 216, § 76.] That act provides, that "no other than the legal title to land, or other real estate, shall henceforth be sold and conveyed by virtue of any execution." *Further*, the equitable title, or claim to land, or other real estate shall hereafter be liable to the payment of debts by suit in chancery, and not otherwise, &c. Under the influence of this enactment, we have held that a purchaser under execution, where the defendant had only an equitable title, acquires nothing by his purchase; that in such case the title can only be made available in satisfaction of the judgment, by suit in

equity; and the law is the same though the defendant in execution was himself in possession. [Doe ex dem Davis v. McKinney, 5 Ala. Rep. 719; Land v. Hopkins, 7 Ala. Rep. 115.] Although the latter provision of the act cited, is in general terms, and is perhaps sufficiently expansive, if literally interpreted to embrace sales of land by executors and administrators, under the sanction of the orphans' court, yet we apprehend the title of the act, its obvious scope and design, would not justify its application to such a case. But if it could be supposed to have been applicable, its operation would be limited by the subsequent enactment of 1822, which we have seen invests the orphans' court with jurisdiction upon the petition of an administrator or executor, to direct a sale of the *real estate* without reference to the character of the title, for the purpose of paying debts, or making more equal distribution among the heirs, &c. [Clay's Dig. 224, § 16.] It is then no objection to the jurisdiction of the orphans' court, that the title to the estate upon which it acted was incumbered with a mortgage, and that the assignee of the mortgagee was in possession.

In Wyman, et al. v. Campbell, et al. 6 Por. R. 219, it was decided that proceedings in the orphans' court, with a view to the sale of the realty, are *in rem* against the estate of the decedent, and that jurisdiction attaches *quoad the thing*, where the petition is regularly filed, and recognized by the action of the court, though the party in interest may not be notified of the pendency of the proceeding; and that a decree of the orphans' court is not void, or collaterally impeachable, although the proceeding may discover errors, for which an appellate court, upon a direct application, would reverse. To the same effect is Perkins' Ex'r v. Winter's Adm'rx 7 Ala. Rep. 855; Doe ex dem Duval's Heirs v. McLoskey, 1 Ala. Rep. N. S. 708. In the case before us, the jurisdiction of the orphans' court attached by the recognition of the petition, the appointment of a guardian *ad litem*, for the infant heirs of the intestate, and ordering citations to issue, *&c.* Whether these proceedings were regular, is now an immaterial inquiry; for the question is not whether the order of sale was voidable, and could have been reversed on error, but was it *void?* We have seen that the jurisdiction was defensible, and consequently it

does not come within the latter category. *This conclusion is the clear result of the cases cited, and furnishes an answer to all the objections made to the proceedings of the orphans' court, previous to the action of the commissioners under its decree.

In respect to the report of the commissioners, in which Mc-Loskey is stated to have been the purchaser of the property in controversy for $5,000, it does not appear from the record before us, that it was ever confirmed. When the case reported in 1 Ala. Rep. 708, was here, we supposed that there was a regular confirmation of this report. We have not looked into the record, which was then before us, but think it probable it does not sustain the assumption, and that the mistake occurred by supposing that the sale of some other portion of the real estate of the intestate in respect to which the orphans' court acted, embraced the premises now sought to be recovered. But however this may be, the mistake had no influence in inducing the conclusion we then attained, and certainly cannot be followed. We must then consider the effect of the order, which directed the second sale, and the consequent proceedings. In Doe ex dem Duval's Heirs v. McLoskey, *supra*, we said, " a court from which an execution issues, may set aside a sale made under it, [Mobile Cotton Press, &c. v. Moore and Magee, 6 Porter's Rep. 679,] on the ground that courts of judicature possess a controlling power over the acts of their officers, and their process. But where a judgment or decree has been perfected, and the term of the court closed, it is not allowable to vacate it on motion." The order of sale and final decree by the orphans' court is assimilated to a decree of foreclosure and sale rendered in chancery, which requires the master to make report, &c. In either case, if the report is confirmed, and the necessary evidence of title, directed to be furnished to the purchaser, it is supposed it would not be competent to set aside the final decree at a subsequent term. It is not said in so many words, that the whole matter is *in fieri*, until it is definitely acted on by the court, but it is clearly intimated, and there can be no doubt that such is the law.

The failure of the orphans' court to confirm the report, and ordering a re-sale, had the effect to annul what had been pre-

viously done by the commissioners, and to release McLoskey from his bid, quite as much as if it had been so declared *in totidem verbis*. The application to set aside the sale, was equivalent to an exception to it, and when an order was made which presupposed the sale to be invalid, by directing the commissioners to again offer the property, the exception was sustained.

Conceding, as it has been said, that the record shows McLoskey moved to set aside all the sales in which he was reported as the purchaser, and afterwards received a conveyance from the commissioners, for part of the property purchased by him, and it does not follow that his motion was necessarily waived *in toto*. It may be that his exception to the report was made in too general terms; that as to a part of the land, it could not be supported, and that conscious of this, or perhaps influenced by other considerations, he was willing that the sales should thus far be approved. However this may be, we cannot think that the acceptance of a conveyance for a part, amounted to a ratification by McLoskey of all his purchases, and was a tacit withdrawal of his motion. There is nothing of which the conclusion can be predicated, that he intended such an effect. It cannot then be assumed that the act was so potent as to divest the jurisdiction of the orphans' court, and make its subsequent proceedings *coram non judice*, and of consequence void. Even if the subsequent action of the orphans' court was irregular, it was at most erroneous; and this we have seen, does not so vitally affect the order for a second sale, as to make the purchase ineffectual.

We will not stop to inquire whether the depositions taken at complainant's instance were rightly suppressed; for the facts proved, fall short of establishing either a trust or a fraud. Certainly there is nothing to implicate the fairness of McLoskey's purchase; the premises were publicly sold, a competition of bidders invited, and the highest price offered by Elliott, who represented him.

The evidence which it is insisted shows a trust, are letters written by McLoskey to Mrs. Duval, in 1828, and subsequently, during her sojourn in Cuba, whither she had been induced by him to go. These letters were doubtless written in the confidence of friendship and affection; among other things

he speaks of real estate in Mobile as her proyerty, or the children's, or intended for them, and as being likely to increase in value, informs her of improvements thereon, either made, in progress, or contemplated. But there is not a scintilla of evidence that Mrs. D., or any one else for the complainants' benefit, ever contributed any amount to refund to McLoskey what he had paid to the Caros, to Hunt, or upon his purchase under the decree of the orphans' court. There is then no pretence of a resulting trust in favor of the intestate's estate, or his heirs ; and the loose and unexplained remarks contained in letters, written under circumstances in which exactness of expression was not observed, cannot furnish the basis of a decree for a specific performance. Such evidence might serve to turn the scale in favor of the complainants, if there was an *equilibrium* of proof upon the question whether McLoskey, was a trustee, or whether he had entered into a contract by which the complainants were entitled to all or a part of the premises in question. But in the absence of such testimony, and in defiance of the answer, denying that the complainants have any rights, either at law or in equity ; that Mrs. Duval, or any one else for their benefit, advanced any part of the several sums which he paid to consummate his title ; or that any thing has been since refunded to him, or that any contract has been entered into with Mrs. Duval, or any one else, by which he stipulated to convey or relinquish to her, or the complainant, the title to all, or any part of them, we think no influence can be accorded to the letters.

We have considered the case upon the hypothesis that McLoskey was merely an assignee of the mortgage, and occupied the situation of a mortgagee, up to the time that he became the purchaser of the equity of redemption, under the order of the orphans' court. A mortgagee in possession, under the provisions of the mortgage, for the purpose of collecting his debt, by the reception of the rents and profits, cannot be considered as claiming adversely to the mortgagor, so as to make a sale of the estate of the mortgagor void, upon the ground of an adversary claim. The mortgagee in such case holds under contract, and it cannot be assumed that he will refuse to relinquish the possession when his debt is paid. The want of the *pedis possessio*, by the mortgagor, or his re-

presentatives, cannot make the order of sale a nullity; nor is there any thing in the relation McLoskey occupied to the premises, that deprived him of the right of purchasing at the sale.

The case of Camp v. Coxe, 1 Dev. & Bat. Rep. 52, is altogether unlike the present. There the court decided, that a sale of the equity of redemption, under an execution at law, at the instance of the mortgagee, for his mortgage debt, is not sanctioned by the act of 1812, which authorizes the sale of an equity of redemption, under such process; that although the words of the act are general, the exception arises necessarily out of the subject and spirit of the enactment. Whether the act would justify a sale by the mortgagee for any other debt is put as a *quere*. But it is not intimated that the mortgagee may not purchase at a sale made under an execution, at the suit of another creditor, and we know of no inhibition which would restrain the mortgagee from purchasing the equity of redemption at such a sale. In the present case, the estate of the mortgagor was decreed to be sold, at the instance of the administratrix, to pay the debts of the intestate generally, and there is nothing in McLoskey's relation to the estate, or in the contract between the mortgagor and mortgagees, which would forbid him from becoming the purchaser. McLoskey then united the titles of the mortgagor and mortgagees, and in respect to them and all claiming through them, his title was perfect. His co-defendants are derivative purchasers, through him, and occupy a situation at least as favorable as he did.

This view is decisive of the case, and relieves us from the necessity of considering the other questions presented by the record, or discussed at the bar. The consequence is, that the decree is affirmed.