EMERSON v. AYRES.

4-5168                                    120 S. W. 2d 16.

Opinion delivered October 3, 1938.

*L. C. B. Young* and *A. W. Young,* for appellant.
*James G. Coston* and *J. T. Coston,* for appellee.

MEHAFFY, J. The appellant began this action by filing a complaint in the Mississippi chancery court. He alleged that on September 22, 1925, he was indebted to the J. T. Fargason Company in the sum of approximately $4,400 and indebted to the Proctor Trust Company in the sum of $9,500; that each of these debts was evidenced by appellant's promissory note secured by deed of trust, and his complaint describes the land. He alleges that on December 30, 1925, the lands described were conveyed by commissioner's deed pursuant to a foreclosure decree to the appellee, C. D. Ayres, for the sum of $4,434.96; that the property conveyed consisted of 160 acres of improved farm lands, three houses and lots in the town of Osceola, and 50 acres of land in front of the St. Francis levee east of Osceola; that prior to said sale appellee Ayres had agreed to purchase said land for the use and benefit of appellant; that appellant, relying on this agreement with Ayres, relaxed his efforts to protect his equity in the lands and thereafter reposed absolute confidence in the good faith and relationship established by said agreement with appellee C. D. Ayres; that appellant paid $1,118.49 of the purchase price and the appellee, Emma Brickey, paid $3,416.47; that the commissioner's deed to appellee Ayres was executed on February 10, 1926; that on December 30, 1926, appellant had executed a mortgage to Emma Brickey on his home in the town of Osceola to secure the sum of $5,416.47; this mortgage has never been satisfied. Appellant alleges that he was advised by Ayres prior to the commissioner's sale that the appellee, Emma Brickey, was furnishing the money in the sum of $3,416.47 and that the title should be held in trust by the said Ayres for the use and benefit of appellant pending the payment of said sum. It was further alleged that C. D. Ayres had been in possession, enjoying the rents and profits from the lands described, since December 30, 1926, and that he had never accounted to

appellant for any rents or profits. Appellant asked for accounting frequently, and appellee, Ayres, stated that when appellant should be in a position to pay in cash the amount remaining due, appellant should have a deed conveying said property; that in March, 1937, C. D. Ayres stated that he would convey to appellant when appellant could offer cash consideration and appellant then asked for an accounting in order to determine what was due; that on March 18, 1937, Ayres refused to convey to appellant for any consideration and refused to convey although appellant was ready and willing to pay any sum which the court found he should pay. Then follows a description of the lands.

Appellant states that Ayres was the holder of the naked legal title, and holds it in trust and benefit of appellant; that the trust relationship was specifically agreed upon prior to the vesting of the title in said Ayres, and that the useful title was in appellant subject to the payment of the indebtedness. His prayer was for an accounting during the period from December 30, 1925, to December 30, 1936, and that the equitable title be vested in appellant, and that upon appellant's paying the indebtedness, the legal title be vested in him.

Notice of *lis pendens* was filed. The appellees answered denying all of the allegations in the complaint. Thereafter appellees filed an amendment to the answer pleading the statute of frauds and adverse possession and laches.

The court entered a decree finding that "this is an action by the appellant, H. T. Emerson, to recover of and from the appellee, C. D. Ayres, the following real estate situated in the Osceola District of Mississippi county, to-wit:" then follows a description of the property involved. The decree then continues: "Upon due consideration of the evidence, the court finds the issues of law and fact in favor of the defendants.

"It is, therefore, considered, ordered, adjudged, and decreed that the complaint of the plaintiff, H. T. Emerson, be and the same is hereby dismissed for want of equity, and the plaintiff will pay all costs of this proceeding, for which execution may issue."

To reverse this decree this appeal is prosecuted.

The appellant states that the following are the issues of law, and argues each of the propositions:

(1) Did the agreement between appellant and C. D. Ayres, entered into prior to the foreclosure sale of the property, constitute the basis of a trust relationship?

(2) Did the purchase of the property with funds borrowed from Emma Brickey, pursuant to the agreement before the sale and secured by a mortgage on appellant's home, constitute the grantee in the commissioner's deed, namely Ayres, a trustee of appellant?

(3) Did the execution of an absolute deed to Ayres pursuant to the agreement with appellant that the title to the lands should be vested in Ayres to secure the debt to Emma Brickey, which was also secured by a mortgage on appellant's home, constitute an equitable mortgage to secure the purchase money debt?

(4) Was Ayres bound by the agreement and his control of the rents and profits from the property to apply annual proceeds to the payment of the debt to Emma Brickey?

(5) Is appellant's suit barred by a statute of frauds?

(6) Is appellant's suit barred by the five-year statute of limitations?

(7) Is appellant's suit barred by the seven-year statute of limitations?

(8) Is appellant's suit barred by the equitable principle of laches?

The first question argued by appellant is whether or not the agreement entered into constituted a basis of trust relationship. It will not be necessary to argue all the questions stated separately. The principal question in the case is as to what the contract entered into at the time or before the judicial sale was. The general rule is stated as follows: "Where one having an interest in land, confiding in the parol promise of another that he will purchase the land, at an impending judicial sale, for the benefit of the former or of some third person in whom he has an interest, takes no steps to protect his

interest in the property, but allows the promisor to acquire the land at such sale, a constructive trust arises, and may be enforced upon a subsequent denial of the promise or refusal to carry it into execution, especially where, the promise being made known at the sale, there is less or no competition and the land is obtained at a low price; and this rule applies even though the promisor in making the promise is moved merely by friendly or benevolent considerations. Unless, however, the influence of such promise operates at the sale, in inducing the promisee to refrain from protecting his interest or in enabling the promisor to secure the property to his own advantage, no trust arises, and so no trust is created by a mere promise to purchase and hold property for the benefit of another or convey it to him if the promisee does not rely thereon to his disadvantage or is not thereby lulled into a false security; nor is any trust created by a promise made after the purchase, since the mere violation of a promise to convey property to the promisee is not such fraud as to give rise to a constructive trust. Moreover, where neither party to an agreement that one will purchase property at a judicial sale and convey it to the other has any interest in the property, and no money is advanced by the promisee to the promisor, nor anything done toward carrying the agreement into effect, the purchase of the property at the sale does not constitute the purchaser a trustee *ex maleficio* for the promisee, in view of the general rule relating to oral agreements to purchase property and convey it to another.'' 65 C. J. 474 *et seq.*

This court, in a recent case, has stated the law as uniformly held by this court for many years. The statement is as follows: ''It is well settled that equity impresses a constructive trust in favor of those entitled to the beneficial interest against one who secures the legal title by means of an intentional false verbal promise, who held the same for a certain specified purpose, and having thus obtained title he retains and claims the property as absolutely his own.'' *Armstrong* v. *Armstrong,* 181 Ark. 597, 27 S. W. 2d 88.

The appellant testified that the lands were sold to C. D. Ayres for the sum of $4,434.96, but that he does not know how the money was paid by Ayres and when it was paid, but that witness mortgaged his home to Emma Brickey in December, 1926, and executed a note to her for $3,416.47, which represented the amount paid on the Ayres judgment. He had some money in the bank at the time, about $1,000 and it was his understanding with Ayres prior to the sale that Ayres would buy in for him and he and Ayres would work the place out of debt. He testified that he explained to Ayres that John W. Edrington had offered to buy part of the land and that he did not want to accept Edrington's offer and Ayres agreed to take it and they would work the thing out together. After Ayres made his proposition Emerson accepted it and did not try any further to take care of his equity. He could have borrowed sufficient money on his home which was worth $6,000 to have paid the Fargason judgment after selling to Edrington, but Ayres told him that Emma Brickey had some money that they could borrow and that she would take a second mortgage to secure the debt. At that time the Proctor Trust Company had a mortgage on 160 acres for $9,500. His home, the three houses and lots and 40 acres in front of the levee were not mortgaged. He told Ayres that he would secure the debt to Emma Brickey with anything he had, with nothing exempt. No one else bid except C. D. Ayres, and Ayres suggested that it would be better to take the deed in Ayres' name. He and Ayres farmed the lands together in 1926; it was the understanding between him and Ayres that the land be purchased in Emerson's behalf. Ayres said he did not want a nickle out of it except the proceeds of ginning cotton. All receipts from the, 1926, crop were paid to Ayres to be applied on the indebtedness. Ayres kept all the records of rents and profits. Witness did not receive or use any cash derived from the operation of the property. Ayres stated that Mrs. Brickey wanted a little more security and he gave him a mortgage on his home, which was all he had. The mortgage has never been satisfied. When witness mentioned the loan to

Mrs. Brickey she always referred him to Ayres. Witness collected rents from his houses in 1926 and part of 1927. Then Ayres collected for a while and then it was turned over to Wilson. He let a tenant have a pair of mules and cultivator for $275 which was paid on the debt to Emma Brickey. Ayres told him that the mortgage on the 160 acres would have to be refinanced. He told Ayres that he thought they ought to wind up the business, and Ayres told him he thought they ought to study it a little. Ayres then told him if he would free Ayres' property that had been included in the mortgage to the Federal Land Bank he would turn it back to witness. Ayres told him that the women would not sign the deed. Witness' only income in 1925 was derived from small areas he farmed. He had absolute confidence in Ayres and no reason to question his management. He could have paid off the debt by borrowing $1,200 or $1,400, and selling the river property to Edrington. He had a great deal of confidence in Ayres and Edrington.

On cross-examination appellant testified that a very small area of the 160-acre tract had not been cleared absolutely of timber, but was being tended in 1925. The levee board paid $318 for a right-of-way on the 40 acres. Ayres bid in the property for $4,434.96. It was their understanding for Ayres to bid it in and pay the difference. Witness had something like $1,000 that went into the deal; does not remember how it was paid; left it up to Ayres to straighten out and attend to. It was understood he was to use the cash witness had in the purchase of the property, but he does not remember the exact amount or how it was paid; had an itemized record, but it burned; turned the cash over to Ayres to credit on his indebtedness because Ayres was in charge of the business. It was his duty to settle and he did get the money; everything was turned over to him after the sale; remembers telling Ayres that the money was in the bank and for him to use it; two or three weeks before the sale and after the sale he told Ayres that the money was in the bank. If there was anything changed on or about the mortgage records, witness did not know it. If the changing benefited anybody it would bene-

fit witness. Witness agreed that his son-in-law, Jordan, could have the town lot, and Jordan gave the order for the abstract at witness' suggestion. The income of the property was sufficient to pay the taxes and interest all these years and show a surplus. Land values fluctuated with the price of cotton; prices were low in 1931 and 1932; the Brickey Mercantile Company furnished the money to make the crop; Ayres settled with the tenants in 1926; nothing was given to witness, and that is the way it has been done up until now. The only complaint he ever made to Ayres was that he thought one of the tenants had not turned in as much as he should. Witness did not refinance the $9,500 mortgage. Ayres told him that he had paid $500 on the principal, which cut it down to $9,000, and that is what the place showed that it made for the last ten years, which was a loss because Ayres had collected $318 from the levee board and $275 from other sources.

C. D. Ayres testified that in December, 1925, Emerson came to him to discuss ways and means of saving his farm. He told witness what was due on it, and witness told him it was a mighty big debt on that property. Emerson said that he did not owe anything on his house, and would give additional mortgage on his home as security; witness told him that he would buy it in; that he would bid the amount of the debt that Mr. Barham said was against it, $3,416.47; witness and Emerson agreed that Emerson should have one year in which to redeem it, and Emerson looked after the place himself in 1926; witness did not have anything to do with it; in December, 1926, Emerson came to witness, handed him a notice from the loan company holding first mortgage; something like $700 was the amount of the interest due; Emerson said he had no money to pay it with, and witness asked him what he had done with the money he got out of the rents; Emerson said he had been paying debts with it; asked him if he had any money, and he said he did not; then said to him: "I'm taking charge of the property now, because I've got to go out and borrow money to pay the taxes and interest," and he did this; told Emerson at the time that Emerson would have noth-

ing more to do with it, and he did not; after witness paid the interest the loan company sent the notices to him; Emerson and his son-in-law came to witness in 1935, and Emerson said he would like to get the thing shaped up where he could redeem that place; witness told him if he could get the money he would still deed it back to him; Emerson's son-in-law came back and said they could not get the money; the mortgage company was pushing witness, and he got busy to refinance it; he filed the original copies of his correspondence with the loan company holding the first mortgage; he felt under no obligations to deed the property back in 1935; he had paid $500 on the principal debt, and he asked for $9,000 in the application for the loan with the Federal Land Bank of St. Louis; the bank would not approve the loan for more than $8,000, and witness had to put in 80 acres in order to get the $9,000; neither Emerson nor his son-in-law said a word about redeeming the land again until after witness had refinanced it; Emerson's statement that the property sold at the foreclosure sale for $4,400, and that he had paid the balance in excess of $3,416.47 is untrue; the property was offered for sale for $3,416.47; Emerson did not contribute one penny; the question of how the rent should be applied for the year of 1926 was not discussed between witness and Emerson; Emerson agreed to execute the note and trust deed to Mrs. Brickey before the sale; the record of the mortgage appears to have been changed with a pen from 1925 to 1926; witness collected the rents for 1926, and has a complete record of everything spent and every penny taken in. Witness then testifies at length about the collections and payment of the money, and then said a little later he told Emerson he had refinanced, and that he would not convey the property then and told him the women would not sign the deed. Witness testified at length as to his dealings with Emerson after he had refinanced the place, and said in December, 1926, he had to pay $1,200 interest and taxes out of his own pocket; that he thought he would be entitled to 15 per cent. for his services for looking after the farm and taking care of deficiencies in the years when there were any. Watham Prewit came to

witness to discuss the matter in 1937, and witness told him that he had already refinanced and was unwilling to reconvey the property.

Quite a number of other witnesses testified, some for appellant and some for appellees, but when the whole evidence is considered it supports the finding of the chancellor. It would serve no useful purpose to set out the testimony in full.

The evidence does not show that there was a trust relationship established by the agreement between Ayres and Emerson. What we have already said makes it unnecessary to discuss paragraphs 2, 3 and 4 in appellant's statement of the issues of law. The only other questions discussed are the statutes of limitations and laches.

We think the evidence shows clearly that the chancellor's view is correct, in finding the facts in favor of appellees. It is the settled rule of this court that a chancellor's finding of fact will not be disturbed, unless it appears that his finding is against the preponderance of the evidence.

To set out all the evidence and argue at length all the questions raised would make this opinion entirely too long. Holding as we do that the agreement did not establish a trust relationship it becomes unnecessary to discuss the other questions raised. The decree is affirmed.