CARPENTER & CARPENTER, INC. v. KINGHAM

(No. 2172; January 21, 1941; 109 Pac. (2d) 463)

318

320

For the appellant, there was a brief and oral arguments by *M. A. Kline* and *Arthur Kline* of Cheyenne.

For the respondent, there was a brief and oral arguments by *Ray E. Lee* and *Clyde Zachman* of Cheyenne.

BLUME, Justice.

## STATEMENT OF FACTS.

In this action the plaintiff, Carpenter & Carpenter, a corporation, alleged that on March 12, 1930, it became indebted to the defendant Kingham; that at that time a deed was executed to defendant for Lots 1, 2 and 3 of Block 99 of the City of Cheyenne, Wyoming, which was intended as a mortgage; that at the same time, the defendant executed a contract of sale for the property; that the mortgage has been paid. Plaintiff asked that defendant be required to convey the property to plaintiff, and for such other relief as is equitable. The court held the transaction to be a mortgage, and ordered an accounting between the parties, and for such further proceeding as the result of the accounting might show to be necessary. The defendant has appealed. The parties will be referred to as in the court below, or by name. The salient facts, omitting some facts which we consider immaterial, are as follows:

On December 12, 1929, the plaintiff executed to defendant a deed for Lot 3 above mentioned. At the same time the defendant executed a contract of sale to the plaintiff, agreeing to convey this property to plaintiff upon the payment of $1600.00. Thereafter plaintiff, having acquired Lots 1 and 2 above mentioned, constructed four houses thereon, borrowed $6100 from the Home Building and Loan Company, and executed a first and prior mortgage for that sum to that company. The company thereafter went into the hands of a receiver. The money so borrowed, however, was not sufficient to complete the houses above mentioned, and plaintiff through Art Carpenter, its manager, applied to defendant for a loan sufficient to complete them. Art Carpenter and the defendant were friends, and to some extent had been chums. It was

agreed between them that defendant should advance money to the plaintiff to complete the houses, that plaintiff should convey to defendant Lots 1 and 2 above mentioned, and also certain property, called the Avalon property, owned at that time by Fannie M. and J. R. Carpenter, parents of Art Carpenter, and that defendant should execute a contract of sale, agreeing to convey to plaintiff these properties upon the payment of $3974.42 and interest thereon, partly payable on August 1, 1930, and partly on February 1, 1931. J. R. and Fannie Carpenter executed a deed to defendant to the Avalon property on February 10, 1930; the plaintiff executed a deed to defendant for Lots 1 and 2 on March 8, 1930, both deeds reciting as consideration the sum of one dollar and other valuable consideration. On March 12, 1930, the defendant executed a contract of sale, selling the property to the plaintiff for the consideration above mentioned. The plaintiff agreed to buy and obligated itself to pay the purchase price therein mentioned. The contract, as well as the deed from plaintiff to defendant, also described Lot 3 above mentioned. That, however, was done by mistake. Plaintiff claims that these transactions, hereafter for the sake of brevity referred to as the transaction of March 12, 1930, constituted a mortgage. Defendant denies this. The testimony on the part of the defendant, including that of the defendant himself and his counsel Mr. Kline, shows that the defendant positively refused to take a mortgage. Art Carpenter testified that Kingham never refused to accept a second mortgage, but that it was considered to be "better" to take deeds and a contract back. Plaintiff also relies upon the testimony of defendant himself, to the effect that the Avalon property was taken as an "accessory" to the transaction, upon various admissions made by the defendant in subsequent years to the effect that plaintiff owed him money, upon the fact that from time to

time, after the defendant had taken possession of the property, as hereinafter mentioned, defendant paid to plaintiff certain amounts of money, in all the sum of $505.00, and upon the fact that the value of the property conveyed to the defendant was greatly in excess of the amount advanced by the defendant to plaintiff pursuant to agreement. The testimony does not show the value of Lots 1 and 2 at this time. Defendant admitted that the Avalon property was a "substantial property," and inferentially admitted that it was worth approximately $9000 or $10,000, with a first mortgage against it of approximately $3000. The contract of sale required the plaintiff to keep the property insured for the sum of $14,000. The defendant advanced to the plaintiff, as the court found, the sum of $3719.14.

The Avalon property remained in possession of J. R. and Fannie M. Carpenter. The plaintiff remained in possession of Lots 1 and 2 until March 28, 1933, collected the rents in the sum of approximately $115 per month, but did not pay to defendant the amounts agreed to be paid in the contract of sale, or any part thereof. Plaintiff, however, paid some amounts on the first mortgages. The sums due on these mortgages, if we may take one of them, which is in evidence, as the criterion, were payable monthly, part of the principal and part of the interest being payable each month. The total amount thus paid is not shown definitely. Inferentially, however, it appears that the principal sum was reduced, while the plaintiff was in possession of the property, by only the sum of $317, so that the total amount paid was approximately the sum of $900.

On March 28 and 29, 1933, the defendant cancelled the contract of sale by serving notice of cancellation on plaintiff and on J. R. and Fannie M. Carpenter, in accordance with the terms of the contract, took possession of Lots 1 and 2 and thereafter collected the rents thereon. J. R. and Fannie M. Carpenter refused

to give up possession of the Avalon property. Defendant thereupon, namely on April 15, 1933, brought an action of ejectment against them. On December 12, 1933, the parties to this suit entered into an agreement or "Stipulation" providing in the opening paragraphs as follows: "In order to settle and adjust the differences between the parties hereto and thus avoid a trial of the above entitled action, it is hereby stipulated and agreed as follows: 1. That for the purpose of this settlement, and for such purposes only," etc. The stipulation then continues, in substance, that defendants F. M. Carpenter and J. R. Carpenter owe Kingham $3219.37 (this under the Contract for Sale of Real Estate of March 12, 1930); that Kingham should deduct from that sum, by reason of his collection of certain rents and an adjustment of the amount thereof, the sum of $463.25, leaving a balance due and owing to Kingham of $2756.12; that defendants should pay to Kingham, on or before March 1, 1934, the sum of $2856.12 in full settlement of his claim against the Avalon property, providing, however, that if such payment is made on or before February 1, 1934, Kingham will remit $100 of that sum; that, upon payment, Kingham should execute and deliver to F. M. Carpenter a quit-claim deed to the Avalon property; that in the event of failure or neglect to pay Kingham the sum so agreed to be paid, "then and in that case it is stipulated and agreed that the Court shall enter judgment for the plaintiff and against the defendants, in accordance with the prayer of plaintiff's petition, finding plaintiff to be the legal owner of said real estate in his petition described, free and clear of all claims of the defendants of every kind or character, and that he is entitled to the immediate possession of said real estate."

The remainder of the stipulation concerns Lots 1 and 2 of Block 99, and provides that, if defendants F. M. Carpenter and J. R. Carpenter will pay to King-

ham, on or before March 1, 1934, the total of the amounts paid by Kingham to the Home Building and Loan Association, together with interest, or if Kingham shall not have made any such payments, then Kingham agrees to quit-claim to defendants' order the property described.

It appears that the defendants in the above mentioned suit, F. M. Carpenter and J. R. Carpenter, made no payments as agreed to be made, and on or about May 31, 1934, after extensive negotiations, Kingham accepted from Frank G. Clark, son-in-law of F. M. Carpenter, the sum of $2430 or its equivalent in full settlement of his claim against the Avalon property and executed a deed to Fannie M. Carpenter. The ejectment suit was thereafter dismissed. Kingham, at the time of his negotiations with Frank Clark concerning the Avalon property, according to his testimony, endeavored to persuade Clark to take a deed to Lots 1 and 2, which the latter refused to do, characterizing the property as "junk."

Plaintiff claims that the foregoing stipulation controls as to the amount due the defendant on the transaction of March 12, 1930, and that the payment made by Clark was for its benefit. It did not pay or offer to pay the balance due as mentioned in the stipulation, but claims that this balance was actually paid by the rentals collected by the defendant. Art Carpenter testified that defendant stated to him that he wanted to retain the title to Lots 1 and 2 for the time being, because of the fact that he had a claim against the receiver of the Home Building and Loan Company, and that the retention of the title would enable him to make a settlement of his claim. It appears that the defendant obtained a judgment against the receiver for the sum of $1530.96 on December 30, 1935. On April 10, 1935, A. E. Wilde, State Examiner, Receiver of the Home Building and Loan Company, which held the first and

prior mortgages on Lots 1 and 2, brought suits in the district court of Laramie County, Wyoming, to foreclose the mortgages, in which suits the Corporation, Kingham and others were named defendants. Judgments were entered in favor of the receiver in each of these suits, one on October 29, 1935, the others on May 25, 1936, the amounts totaling $7768.68. Thereafter the property (Lots 1 and 2 of Block 99) was sold to the receiver by the sheriff of Laramie County. During the pendency of these suits, and on May 19, 1936, Wilde, as Receiver, and Kingham, entered into an agreement whereby Wilde promised to convey the real estate involved, upon the termination of the actions, to Kingham for the sum of $4500. The consideration for this promise on the part of Wilde was certain concessions made by the parties in the settlement of and credits for Kingham's judgment against the receiver of December 30, 1935. In accordance with the terms of this agreement, Wilde, on May 20, 1937, executed a Receiver's Deed in favor of Kingham for Lots 1 and 2 of Block 99, which receiver's deed was duly recorded on June 7, 1937.

When the foreclosure suits were commenced, Mr. Kline, counsel for the defendant, hoping to enforce the latter's claim against the receiver in connection with these suits, wanted the plaintiff to appear therein so as indirectly to help the defendant in connection with the latter's claim. The testimony on behalf of the defendant shows that at first the plaintiff refused to have anything to do with these suits, Art Carpenter stating to Kingham "that's your affair." However, to help the defendant he permitted Kline to file an answer in the suits, or at least in part of them. He refused to pay any attorney fee, and never paid any, although he testified that he thought that he had paid some "indirectly." The testimony indicates that after the plaintiff had permitted the filing of answers in the suits, it

paid no further attention thereto. The testimony of Art Carpenter conflicts to some extent at least with the testimony on behalf of the defendant. He stated that when these foreclosure suits were brought "I went to Mr. Kingham right away and we talked it over and I brought out the point that if the payments had been kept up as we were keeping them up, that this foreclosure would not have started, if he had used income from the property for that purpose like we did, that it wouldn't have reached that stage, and he said, well, that he realized that, but in order to protect his interests he had done it that way, and that he would go ahead and protect our interests and his own." Some other facts will be mentioned in the opinion.

## OPINION.

■ Counsel for defendant pleaded, and contend in this court, that the plaintiff had no capacity to sue and bring the action herein. It appears that the plaintiff corporation was dissolved in 1932 by a proclamation of the governor by reason of failure to pay the annual tax provided by law. Section 28-1002, Rev. St. 1931, provides as follows:

"If any domestic corporation shall for two consecutive years neglect or refuse to pay the license tax herein provided, the certificate of incorporation of such corporation shall be forfeited in the manner hereinafter provided and upon such forfeiture, all powers, rights and franchises conferred by law upon such corporation shall cease and terminate and become inoperative and void. * * * Any person or persons who shall exercise or attempt to exercise any powers for or on behalf of any corporation named in such proclamation after the publication of such proclamation and the filing of proof thereof in the office of the secretary of state shall be deemed guilty of a misdemeanor and shall be punished by a fine not exceeding $1000.00, or by imprisonment not exceeding one year, or both."

This statute was amended and re-enacted by Chapter 13 of the Session Laws of 1937, but the provisions quoted above were not changed. There is no doubt that if these provisions stood alone the plaintiff would have no right to sue in this case, since the dissolution of a corporation is equivalent to its death, and no action can be brought by it thereafter except only as provided by the statute. On the other hand, if the statute permits it to sue or be sued thereafter, the objection that it was dissolved does not lie. Fletcher, Cyc. of Corporations, Secs. 8142 and 8143. Section 28-1108, Rev. St. 1931, provides as follows:

"No suit or action whereto any corporation is or may be a party, shall abate by reason of the dissolution of such corporation by expiration of its charter of incorporation or otherwise; but the trustees or directors of such corporation, acting as trustees to the stockholders and creditors after the dissolution as herein provided, or the survivors of them, or the trustee or trustees, receiver or receivers, appointed by the decree of any court of competent jurisdiction, may prosecute or defend such suit or action in the name of the corporation dissolved, notwithstanding the dissolution."

Section 28-1109 provides:

"Any corporation dissolved may, notwithstanding such dissolution, prosecute an action at law in the corporate name, for the use of the person entitled to receive the proceeds of such suit, upon any cause of action accrued, or which, but for such dissolution, would have accrued to such corporation and in the same manner, and with like effect as if such corporation were not dissolved."

These sections were first enacted in 1876, and have not been changed since that time. Section 28-1002, supra, providing for the forfeiture of corporate rights for non-payment of annual taxes, was first enacted in 1925, and the question remains as to whether or not the law of 1876 above mentioned applies in this case.

See 19 C. J. S. p. 1507. In 1896, New Jersey revised its general corporation law by Chapter 185 of the Session Laws of that year. Sec. 53 of that chapter provided that corporations should continue their existence for the purpose of prosecuting and defending suits by or against them and of enabling them to settle and close their affairs. Ch. 187 of the Session Laws of that year, a separate act, provided for the forfeiture of corporate existence of corporations which failed to pay the annual tax as required by the act. The act is very similar to our legislative act of 1925, supra, and provided that any person or persons who should exercise or attempt to exercise any powers on behalf of such corporation after forfeiture should be guilty of a misdemeanor and punished by imprisonment not exceeding one year or a fine not exceeding one thousand dollars. In American Surety Co. v. Great White Spirit Co., 58 N. J. Eq. 526, 43 Atl. 574, the court held that all of the laws relating to corporations should be construed in pari materia and that accordingly a corporation dissolved by forfeiture of its charter is subject to suit for the purpose of winding up its affairs. The holding has been followed in Grey, Attorney General, v. Plank Road Company, 65 N. J. Law 603, 48 Atl. 557; Watts v. Vanderbilt, 45 F. (2d) 968; Harris-Woodbury Lumber Co. v. Coffin, 179 Fed. 257 and cases cited. The general law of Florida prior to 1935 provided for dissolution of corporations, and that they should be subject to suits and have the right to sue after dissolution for a certain period of time. In 1935 the legislature of Florida enacted a law similar to our law of 1925, supra, for forfeiture of the charter of corporations, without making any provision for continuance for any purpose of the corporation after forfeiture. In McClung v. Hill (CCA), 96 Fed. 236, it was held that the acts should be construed in pari materia and that the general law providing for the continuance of a corporation for

certain purposes is applicable to corporations whose charters have been forfeited. In Lusk Lumber Co. v. Independent Producers Consolidated, 43 Wyo. 191, 299 Pac. 1044, the question was as to whether or not a suit brought against a corporation whose charter had been forfeited under the act of 1925 should be abated, and this court held that section 28-1108, supra, should govern, according to which the action did not abate. It would seem that, if section 28-1108 should be construed in pari materia with the act of 1925, supra, that should be true also with section 28-1109, part of the same legislative act of 1876, and according to which a corporation may sue notwithstanding its dissolution. The Lusk Lumber Company case, which placed a construction upon the legislative act of 1876, supra, was decided in 1931. Yet, when the legislature re-enacted the law of 1925 by Chapter 13 of the Session Laws of 1937, it made no provision on the point here involved other than it had made when the law was first enacted in 1925, and may, therefore, be said to have concurred in the construction adopted in the Lusk Lumber Company case, supra.

The rule that statutes should be construed in pari materia is well known. It is true that when the general law relating to dissolution of corporations was enacted in 1876 no dissolution by forfeiture was probably contemplated. However, statutes framed in general terms, as was the act of 1876, apply, in the absence of a contrary indication, to new cases and new situations which arise and which come within the general scope and policy of the law. 25 R. C. L. 778; Pellish Bros. v. Cooper, 42 Wyo. 480, 38 P. (2d) 607; Board of County Commissioners v. Brewer, 50 Wyo. 419, 62 P. (2d) 685. The provisions of Sections 28-1108, -1109, supra, are broad and general, and hence apply, in the absence of contrary indication, to any corporation which is dissolved in any manner known to the law. The act of

1925, providing for the forfeiture of the charter of corporations, covers a specific subject, and if the special act were inconsistent with the general law, the provisions thereof would control. 59 C. J. 1056-1058. In Seventy-Three First Ave. Corp. v. Braunstein Bros. etc. Corp., 168 Misc. 842, 6 N. Y. S. (2d) 664, affirmed in 170 Misc. 657, 10 N. Y. S. (2d) 868, and in Application of S. M. & J. Eisenstadt, 256 App. Div. 488, 10 N. Y. S. (2d) 868, it was held that the general law relating to the dissolution of corporations did not apply to corporations the charter of which had been forfeited under a special provision of the statute. In these cases, however, the act providing for the forfeiture of corporations made specific provision, though limited in extent, as to what should become of the affairs of the corporation after the forfeiture of the charter. So if the act of 1925 above mentioned had made a provision, even though of limited extent, in reference to what should become of a corporation or its affairs after its charter had been forfeited, the foregoing cases might well be applied. But there is no such provision, and the New York cases, accordingly, are not in point. The cases from Michigan, cited by counsel, are not in point. The statute is set out in Irvine & Meier v. Wienner, 212 Mich. 199, 180 N. W. 492. It specifically provides that while a corporation is in default for non-payment of a license fee, it shall not have power to sue. Most of the California cases cited by counsel were decided under legislation which contained no such provision as contained in our sections 28-1108-1109, as will appear from what the court specifically stated in Crossman v. Vivienda Water Co., 150 Cal. 575, 89 Pac. 335, cited by counsel. In Boyle v. Lake View Creamery Co., 9 Cal. (2d) 16, 68 P. (2d) 968; Ocean Park etc. Co. v. Pacific Auto Park Co. (Cal. App.) 98 P. (2d) 1068, the courts considered a statute suspending the powers of a corporation for non-payment of taxes, but which

contained an exception, and it was held that the suspended corporation had no power except that contained within the exception. These cases, accordingly, are somewhat analogous to the New York cases mentioned above, and are not in point here. We think that the objection here under discussion must be overruled.

■ Lot 3 above mentioned was conveyed to the defendant on December 12, 1929, and the latter had executed a contract of sale of it to the plaintiff for the sum of $1600.00. Yet the lot was included in the contract of sale dated March 12, 1930. The defendant pleaded that this was done by mistake. The court so held, and the finding is so obviously correct as to be beyond controversy, notwithstanding the testimony of Art Carpenter to the contrary. But the court went further, and held that the deed to the lot of December 12, 1929, constitutes a mortgage. No issues were joined on that point. There is nothing to show that the parties voluntarily enlarged the issues raised by the pleadings. Testimony as to this lot naturally came into this case incidentally, and in connection with the issue of mistake. The court refused to permit some testimony on the part of the defendant relating thereto, in order to explain some testimony given on the part of the plaintiff, stating that Lot 3 was not in issue except as to the allegation of mistake above mentioned. The judgment of the trial court, accordingly, finding that the deed of December 12, 1929, is a mortgage, and the order of accounting in connection therewith must be set aside and vacated.

■ The points raised herein in connection with Lots 1 and 2, in question here, are numerous and involved, and we have found great difficulty in deciding the issues in connection therewith. Such difficulty frequently, of course, exists in equity cases. The term "justice" has been debated for centuries. Volumes have been written on the subject. But no one has been

able to give us absolute criteria to be applied in a particular case. Frequently the most careful consideration, and the application of the sense of justice which to a more or less extent is in us all, leaves us in doubt as to what is justice in a case before us. That is true in the case at bar. By reason of human fallibility, justice can be but relative; it cannot be exact. And although qualms and misgivings still remain with us, we trust that our sense of justice has not gone astray too far. From a broad standpoint, the following propositions, as shown by the evidence, seem to represent at least a reasonable degree of truth: First: If Kingham, the defendant, gets back his money with interest and a reasonable compensation for looking after the property involved herein for and on behalf of the plaintiff, he does not have any serious ground of complaint, though the property is decreed to be that of the plaintiff. Second.: The statement of counsel for the defendant seems to be correct that the plaintiff put very little money of its own, if any, into the property, but collected about $4000 in rent. If we may take as correct the apparent admission of plaintiff's manager that he reduced the principal of the first and prior mortgage only by the sum of $317, he paid a total sum on that loan of approximately $900 during a period of about three years. He also paid general taxes, which probably did not exceed $600. His expenses on the property, while new, were probably not large. So that he probably netted out of the property $2000 or more to compensate him for the trouble of initiating the building and construction of the houses involved herein, and plaintiff, accordingly, cannot have any serious ground for complaint if the property in controversy is adjudged to be that of the defendant. Third: Disinterested testimony in the case shows that the value of the lots in question at the time of the trial of this case and for some time previously was approximately

$5500. The amount due on the first mortgage against it was over $7000. Plaintiff, accordingly, had no interest or equity left in the property. Kingham bought it for $4500, but whatever equity is in the property was created by the dealings of Kingham with the receiver. The scales of justice, then, on the face of the situation, seem to tip in favor of the defendant on that feature of the case. We have made these preliminary observations with the thought in mind that we do not have before us a case in which Shylock has attempted to exact his pound of flesh—a factor frequently taken into consideration in cases such as that before us—and the absence of which helps the "chancellor's foot" to go forward with a greater degree of certitude. We shall proceed and consider the transaction of March 12, 1930, and the transaction with the receiver, separately.

(a) If the trial court had held that the transaction of March 12, 1930, did not constitute a mortgage, such holding would have been supported by ample testimony. But the court did not so hold, but held the contrary, and we are inclined to believe that its holding is supported by substantial testimony. We are in doubt that we should be justified in reversing the trial court on that point. It would subserve no good purpose to review the testimony in detail. The main outlines have been set out in the statement of facts. We stated in Baldwin v. McDonald, 24 Wyo. 108, 156 Pac. 27, that a deed to property, with a contract to reconvey, may or may not constitute a mortgage. Quoting from Pomeroy on Equity, it was said that "whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase must to a large extent depend upon its own special circumstances; for the question finally turns, in all cases, upon the real intention of the parties as shown by the face of the writings, or as disclosed by extrinsic evidence." We have no doubt as to the intention of Mr.

Kline, who acted as counsel for the defendant, and who counselled the latter to refuse a mortgage, and it is held that when a mortgage is refused, the transaction will not be construed to be such. 41 C. J. 337. But we are not so certain as to the intention of the defendant himself, who, as the record shows, at times did not follow the advice of his counsel. One of the reasons, if not the main reason, which leads us to doubt that we are justified in reversing the trial court on the point here considered is because of the testimony of the defendant that the Avalon property was taken as an "accessory," and because of the disproportion between the amount advanced and the value of the property deeded to defendant. The term "accessory" is equivocal. It may be construed as "security." It has been held that the use of the term "redeem" in a contract made collaterally with a deed is usually held to imply the existence of a debt and to negative the idea of a sale. 41 C. J. 327. Similar reasoning may well apply to the term "accessory," even though it was not used in the contract of sale involved here, but only in the testimony of the defendant. The defendant testified that the Avalon property was a "substantial" property. Inferentially he admitted that it was worth $9000 to $10,000. It appears that the first mortgage against it was approximately $3000, leaving an equity of about $6000 or more. The contract for sale provided that the property covered thereby should be kept insured in the sum of $14,000, indicating that the value of the property conveyed by the deeds was greatly in excess of the amount of money which the defendant advanced at the time to the plaintiff. That is an element which is considered in cases such as we have before us. Gould et al. v. McKillip, et al., 55 Wyo. 251, 99 P. (2d) 67; 41 C. J. 337. Even though the defendant served notice of cancellation of the contract in the spring of 1933, taking his attitude as a whole, including that in the

spring of 1934, it does not indicate that he intended to arbitrarily deprive the plaintiff, and the parents of the plaintiff's manager, of an equity so greatly in excess of the money which he had advanced.

We think, accordingly, that the defendant should account for the net rents received by him up to the time when the time of redemption from the foreclosure of the first mortgage expired, and for the sum of $2430 received from Frank Clark. But we cannot agree with counsel for the plaintiff that the contract of December 4, 1933, entered into by the defendant and J. R. Carpenter and Fannie M. Carpenter should control. Though probably without prejudice, we think that the admission of that contract in evidence was improper for various reasons. It was a contract of compromise entered into with J. R. and Fannie M. Carpenter, and not with the plaintiff in this case. It is stated that a compromise entered into with third persons is not admissible in evidence except under exceptional circumstances. 22 C. J. 320. We do not find any exceptional circumstances in this case. If that agreement had characterized the transaction of March, 1930, it might be different. But the statements therein contained are entirely consistent with the fact that the amounts mentioned should be paid to the defendant under a contract of sale, rather than under a mortgage. It is stated in 4 Wigmore on Evidence (3rd ed.) 31, that an offer of compromise which has been accepted may be made the basis of suit. Completed contracts of compromise have even been admitted in evidence in suits upon the original contract. Harris v. Miller, 196 Cal. 8, 235 Pac. 981; Dugger v. Kelly, 168 Iowa 129, 140, 150 N. W. 27; Lane v. Lumber Co., 101 Okla. 14, 22 Pac. 968; 22 C. J. 317. These cases are consistent with the fact that the compromise was, in a measure at least, sought to be enforced. And the completed agreement in this case doubtless would have been ad-

missible in evidence, or would have furnished the basis of a suit on the part of J. R. and Fannie M. Carpenter, or their assigns, if it had been carried out on their part. But it was not. The agreement provided that the money which the defendant agreed to accept should be paid on or before March 1st, 1934. Strangely enough, counsel for the plaintiff think that this was immaterial. We do not think so. In a measure, the time for payment therein fixed was an extension of the time of payment mentioned in the contract of March 12, 1930. It has been held that such extension is evidence of the fact that time was of the essence. 13 C. J. 687; Wiswall v. McGowan, 2 Barb. 279. In Lock v. Bell (1931) 1 Ch. 35, it was held to be absolutely controlling. Moreover, the agreement provides that Kingham would accept $100 less than the amount agreed to be paid on March 1, 1934, if the payment should be made a month sooner. It further states that the defendant would not convey or encumber the property prior to March 1, 1934. These provisions, aside from the testimony of defendant, show that time was considered of importance. The agreement also states that if the money should not be paid at the time fixed, the Avalon property should belong absolutely to the defendant. Had a similar provision been made as to Lots 1 and 2, it is not improbable that the contract would have been held to be controlling. The dealings with Frank Clark on May 31, 1934, were not pursuant to the stipulation. In any event, it would be wholly unjust that under the circumstances the defendant should be entitled to credit only for the amounts specified in that agreement, if he can show that he is entitled to additional amounts.

We see no reason why we should disturb the finding of the court that the amount secured by the transaction of March 12, 1930, is the sum of $3,719.14. No exception was taken thereto and there is substantial evidence to support it. In the accounting, accordingly,

the defendant should be allowed that sum, with proper interest thereon, and all other sums which he properly paid out in connection with Lots 1 and 2, consisting of sums paid out for taxes, insurance, repairs and other matters, and the further sum of $505, which the plaintiff admitted to have received from Kingham, and any other sums, if any, legally due. And on account of the character of the property, and the difficulties attending the renting, equity in this case requires, we think, that defendant should be allowed a reasonable compensation for looking after the property from the time that he took possession up to the time when the period of redemption expired under the foreclosure of the first mortgage by the receiver. See Walter v. Calhoun, 88 Kans. 801, 129 Pac. 1176.

■ The defendant became purchaser of the lots in question from the receiver who had brought proceedings to foreclose the first mortgage. The plaintiff and the defendant were parties to the case. Judgment was duly entered for the amount due on the mortgage in the sum of $7768.58, the property was offered for sale after notice by publication, was bid in by the receiver who received a deed therefor, and who deeded the property, in March, 1937, to the defendant, pursuant to a contract entered into before the judgment was rendered, for the sum of $4500—that sum being arrived at through a compromise with the defendant who had a judgment against the receiver for about $1500. The trial court made no findings of fact relating to this matter, so that we are at liberty to make our own findings, in so far as that may be necessary. Nor did the court make any conclusions of law thereon. It apparently thought, although we do not know upon what theory, that since the transaction of March 12, 1930, was a mortgage, it would embrace within its purview the dealings between the defendant and the receiver. Counsel for plaintiff argue that the defend-

ant was paid all sums due him sometime during the year 1934; that thereupon the defendant held the title in trust for the plaintiff, and conclude that whatever was thereafter done in connection with the property by defendant was done as trustee for the benefit of the plaintiff. The contention is rather novel. This court has gone as far as any court in holding fiduciaries strictly to account. See Binning v. Miller, 55 Wyo. 478, 500, 102 P. (2d) 64, 74. But we can not agree with counsel in the contention here made. The mere designation of defendant as "trustee" does not have the result claimed by them. There is no particular magic in a name, not even in that of "trustee," although that term perhaps comes nearer to it in our law than any other legal term. Counsel have not cited us to any authority sustaining their contention, and we presume that they have been unable to find any. We have looked for one in vain. If defendant was still a second mortgagee—that is to say, if the whole amount due him had not yet been paid, as he claims—he had a perfect right to buy the first and prior mortgage and step into the exact shoes of the first mortgagee. McAllister v. Catchings, 210 Ala. 392, 98 So. 303 and cases cited; Dobson v. Land, 8 Hare 216, 220; Scott on Trusts, Sec. 9. He was not a trustee, except, perhaps, under certain circumstances, for a limited purpose. King v. Insurance Co., 7 Cush. 1, 7. A fortiori, he would have had the right to buy the property from the receiver. In Murdock's Case, 2 Bland. 461, 20 Am. Dec. 381, it was held that a creditor or mortgagee is not forbidden to buy the property of the mortgagor at a sale under direction of the court, since the relation between them is adverse and not fiduciary. We can see no reason why this right should be suddenly changed by the mere fact that, as plaintiff claims, he had already been paid the full amount. Clearly he was then, in effect, in no different a position from one who had held a straight

mortgage, but who had neglected to release it of record. No one would call such mortgagee a trustee by reason of such neglect. If the full amount had in fact been paid to defendant, who held the legal title, equity would regard such title as already transferred (65 C. J. 519) leaving a mere ministerial act to be performed. No fiduciary relation, in the proper sense, would be created. The situation would not be altogether dissimilar to that contemplated by the statute of uses of 1535, which provided, in substance, that the legal title should be considered in the equitable owner in cases in which a person held land for the use of another. See 1 Scott on Trusts, Sec. 67; 65 C. J. 516, 519; Perry on Trusts (7th ed.) Sec. 521. The defendant would have held the mere dry or naked title. The holder of a naked or dry trust has no active duty to perform. 65 C. J. 227, 363, 523 and cases cited; Shelton v. Harrison, 182 Mo. App. 404, 167 S. W. 634, 638. Pomeroy on Equity (fourth edition, sections 75 and 988) seems to confine the use of the terms naked, dry or passive trusts to express trusts. That is probably historically correct, arising as they did originally out of the statute of uses above mentioned. But for want of a better word, they may be applied to a situation such as we have before us. Certainly no active duty can be implied in such a case any more than in a case of a naked or dry trust created expressly. No duty, then, existed to protect the plaintiff. Defendant, in such case, could not, of course, convey the title to the prejudice of the plaintiff. But that duty could apply only to the particular title which he then held, and no reason can be given why the defendant would not, in such case, have the same right which he had before his mortgage was paid off, and why he could not acquire a title which was independent of the title which he held as naked trustee. Although there is authority to the contrary, it is even held by several courts, including

the Supreme Court of the United States, that a trustee of an active trust may purchase for himself property offered at a judicial sale brought about by a third person, and over which the trustee has no control. 65 C. J. 479, 771. See Bogert, Trust and Trustees, Sec. 486. In Morawitz, Priv. Corp. Sec. 521, it is stated that an "agent of a corporation may purchase claims against the company at a discount, and enforce them in full, if he is not under obligation to make the purchase on behalf of the corporation." In Inglehart v. Thousand Island H. V., 32 Hun. 377, it is stated that "a trustee or director may with his own money purchase for himself of a third person, a valid and subsisting outstanding debt owing by the company, and secure a perfect title thereto. Such a transaction is not even the ground for entertaining the suspicion that it is a violation of any duty which he owes the corporation, and there is no presumption of law against its fairness * * * I am unable to discover any reason why he should not be permitted to enforce payment for the full amount, nor can I find any decision limiting the trustee to the sum actually paid." See also Glenwood Mfg. Co. v. Syme, 109 Wisc. 355, 85 N. W. 432; Seymour v. Cemetery Ass'n., 144 N. Y. 333, 30 N. E. 365; 26 L. R. A. 859. In Barber v. Bowen, 47 Minn. 118, 49 N. W. 684, it was held that a guardian of a minor is not forbidden to purchase property belonging to the ancestral estate of the minor, when the property is sold by the administrator of the estate. These cases are cited only to show that merely to designate defendant as "trustee" does not make him so in the same sense that his acts must be for the benefit of the plaintiff. In Coffee v. Ruffin, 44 Tenn. 487, 511, 514, the court recognized the fact that a person who is trustee nominally only is not bound by the same rule as a person whose duties, as trustee, are active. And Perry on Trusts (7th ed.) Sec. 521, states that "so impersonal

are the relations of dry trustees to the cestui que trust that it is said that they may purchase the estate of the beneficiary." That was held to be true in Parker v. White, 11 Ves. Jr. 209, 226, of a trustee "not to sell." That would be a situation somewhat similar to that in the case at bar, although it would seem that if a trustee of an express trust "not to sell" can buy the property, it should be much more true in a case like that at bar, in which the defendant, if he could properly be called a trustee at all, became so only involuntarily upon the payment of his mortgage indebtedness. And finally, the Restatement of the Law of Trusts, page 31, after relating that the historical development of trusts and mortgages is different, and that a mortgage is not a trust, states that "even after the payment of a debt secured by a mortgage, the mortgagee does not become a trustee even in states in which the legal title to the mortgaged property is and remains in the mortgagee until he reconveys it to the mortgagor." See also Scott on Trusts, Sec. 9; Bogert, Trusts and Trustees, sections 29-32.

If, then, the defendant became a trustee at all in the sense that he holds the property in trust now, it must be under a different theory. There is an assertion in the record on the part of the plaintiff that the defendant bought the property from the receiver with money belonging to the plaintiff, and counsel for the plaintiff perhaps believe that by reason of that fact a trust resulted in favor of the plaintiff. But the assertion is not sustained by any evidence in the case. The mere fact that the defendant may have owed money to the plaintiff is no evidence of the assertion. Perhaps counsel claim that the defendant is a constructive trustee. They mention the fact that the contract entered into between defendant with the receiver was fraudulent as to plaintiff. We might mention in that connection that we have examined the contract under which the

receiver agreed to sell, under certain conditions, the property in question here. The contract was entered into in order to reach a compromise of the disputes between the receiver and the defendant. It in no manner whatever interfered with, or attempted to interfere with the right of the plaintiff to buy the property at the sheriff's sale, to redeem the property from the sale, or to protect itself in any other way. Furthermore, it is shown by testimony of the defendant, not contradicted, that plaintiff was informed of the making of the contract. The point, however, we think, is immaterial. The record also discloses the following testimony of Art Carpenter, upon which counsel for plaintiff apparently rely:

"When these foreclosure suits were brought I went to Mr. Kingham right away and we talked it over and I brought out the point that if the payments had been kept up as we were keeping them up that these foreclosures would not have started, if he had used the income from the property for that purpose like we did, and he said that he realized that, but in order to protect his interests he had done it that way and that he would go ahead and protect our interests and his own."

This testimony, while not contradicted directly, is entirely inconsistent with the testimony of defendant and Mr. Kline, who stated that plaintiff did not want to appear in the foreclosure proceeding, did not consider that it had any interest therein, and did so only to help out defendant at the request of Mr. Kline. We see no escape from crediting that testimony. In the first place, the statement that defendant would protect the interests of plaintiff has as its basis the preceding facts, namely, that plaintiff had kept up the payments on the first mortgage, and that defendant thought he should have applied the rent likewise. But apparently plaintiff kept up its payments for only about 12 months out of about 36. Defendant had the right to apply the

rents on his own indebtedness, and that he wanted to do that is evidenced by the fact that he made many efforts to collect what was due him. If these facts are correct, the basis above mentioned is weakened, if not entirely destroyed. Moreover, the evidence indicates that the property was worth approximately $5500. There is no claim that any of the indebtedness under the first mortgage was invalid. It amounted to $7000 or more. Hence the interest of plaintiff therein was worthless. We can well believe that Frank Clark called the property "junk." It is true that Art Carpenter testified that he asked defendant numerous times for an accounting. The truth seems to be that plaintiff had virtually abandoned all claims to the property until September 4, 1937, which was a number of months after defendant had received his deed from the receiver, and had reduced the indebtedness under the first mortgage, so to speak, to the sum of $4500. That is corroborated by the fact that after Art Carpenter had seen Mr. Kline about the foreclosure proceedings, he paid no further attention to the suit, though the proceedings were public and though notice of the sale of the property was published. It is true that counsel for plaintiff argue that, on account of intimate friendship with plaintiff's manager, Kingham stood in confidential relation to plaintiff. But friendship is not sufficient to show such relationship. Higgins v. Title and Trust Co., 312 Ill. 11; Rubin v. Midlinsky, 321 Ill. 426, 152 N. E. 217. Courts are inclined to deny such relationship "in the cases of mortgagor and mortgagee, pledgor and pledgee, applicant for a loan" etc. Bogert, Trusts and Trustees, Sec. 482; Scott on Trusts, Sec. 9. Moreover, it would seem to be somewhat far-fetched to claim the existence of confidential relationship after Kingham had given notice of the cancellation of the contract of sale, and had brought

an ejectment suit in connection with the Avalon property.

If we assume, however, that Kingham made the statement that he would protect plaintiff along with himself, the statement is altogether too vague and indefinite upon which to found a constructive trust. Counsel for defendant thinks that it means that defendant would protect plaintiff in the pending suit, but that there was nothing to protect. Perhaps so. We might conjecture numerous other meanings. In Dunn v. Dunn, 59 Idaho 473, 83 P. (2d) 471, 474, the court stated that "a constructive trust cannot arise out of vague, indefinite, ambiguous or casual statements or declarations. It must be established by reasonably clear and definite statements or declarations or equally clear and definite evidence of acts and conduct to that effect." In Rubin v. Midlinsky, supra, the court stated that "while counsel do not clearly state the character of trust which they contend exists here, we gather that it is sought to establish a constructive trust. While such trust may be established by parol testimony, the proof must be clear and convincing, and so strong, unequivocal and unmistakable as to lead to but one conclusion." Bogert on Trusts and Trustees, Section 472, states:

"As with the proof of express and resulting trusts, so in the case of the establishment of constructive trusts, the courts have announced that they require 'clear and convincing' evidence. Other judicial expressions are even stronger in their demands. 'If the evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust, it is not sufficient to support a decree declaring and enforcing the trust.' Sometimes the requirement is stated to be that the facts leading to the decree establishing the constructive trust must be proved 'by greater weight than the mere preponderance of the evidence' or beyond a reasonable doubt. These statements reflect

judicial caution in accepting oral evidence which is intended to contradict absolute conveyances in deeds and wills and overturn record titles."

Moreover, a mere promise, without more, to protect any interest which the plaintiff had would not, at least in the absence of confidential relationship, as here, be sufficient to make the defendant a constructive trustee. In order that the doctrine of trusts ex malificio with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal; there must be an element of positive fraud accompanying the promise and by means of which the acquisition of the legal title is wrongfully consummated. Reed v. Furniture Co., 93 Okl. 212, 220 Pac. 900; Oliphant v. Rogers, 186 Okl. 70, 95 P. (2d) 887; 65 C. J. 455, 458, 473. The receiver had a right to sell his interest to anyone he pleased, with the consent of the court, and the defendant had the right to buy it, whether with knowledge of the plaintiff or without it. There was no fraud in that. In order to give any rights to plaintiff at all, who itself did nothing whatever to save its property, reliance upon the promise would have been necessary. 65 C. J. 473; Bardon v. Hartley, 112 Misc. 74, 87 N. W. 809; Emerson v. Ayres, 196 Ark. 791, 120 S. W. (2d) 16; Moore v. De Bernardi, 47 Nev. 33, 213 Pac. 1041; Scott on Trusts, Sec. 499. There is no evidence whatever that plaintiff relied upon any promise of the defendant. On the contrary, as already stated, it paid no attention whatever to the suit of foreclosure, and the sale in connection therewith, practically from the time of the commencement of the proceeding in the spring of 1935 up to about September 4, 1937. We have already stated the reasons. It is quite apparent that plaintiff would not now be asking for the title to the property, if the amount of the first mortgage were still a lien against it.

We cannot, accordingly, hold that plaintiff has established a constructive trust. And we know of no other reason which would justify us in taking the benefits, if any, arising out of the dealings with the receiver, away from the defendant and give them to the plaintiff. The cross petition of defendant, accordingly, to quiet his title to the premises should have been granted.

The judgment of the trial court is accordingly affirmed in so far as holding that the transaction of March 12, 1930, constituted a mortgage, that defendant at that time advanced to plaintiff the sum of $3719.14, that an accounting should be had between the parties, and that Lot 3 was included in the transaction of March 12, 1930, by mistake. That accounting, however, so far as the rents are concerned, must be limited to the period commencing with the time when defendant took possession of Lots 1 and 2 involved herein, and ending with the time when the period of redemption under the foreclosure by the receiver expired, and it must be had in the manner heretofore pointed out. The judgment of the trial court is reversed as to Lot 3 involved herein, in so far as heretofore mentioned, and the cause is remanded to the trial court with direction to quiet the title to Lots 1 and 2 in the defendant and for such other purposes as are not inconsistent with this opinion.

*Affirmed in part, reversed in part,
and remanded with directions.*

RINER, Ch. J., and KIMBALL, J., concur.

### ON PETITION FOR REHEARING

BLUME, Justice.

A petition for rehearing has been filed herein by plaintiff. We held in the original opinion, which appears in 109 P. (2d) 463, that a mortgagee holding an

inferior lien has the right to purchase a superior lien, or purchase the property under such superior lien, without becoming a trustee for the benefit of the mortgagor. To the same effect as the cases cited in the original opinion are the following: Ten Eyk v. Craig, 62 N. Y. 406; Cornell v. Woodruff, 77 N. Y. 203; Williams v. Townsend, 31 N. Y. 411; Woodley v. Burch, 43 Mo. 231, 234; Walthall's Executors v. Rives, Battle & Co., 34 Ala. 91, 97; Harrison v. Roberts, 6 Fla. 711; Shaw v. Youmans, 105 App. Div. 329, 94 N. Y. S. 178; Darcey v. Hill, 1 Vern. 49, 23 Eng. Reprint 302; Parkman v. Hansbury, 1 Dr. & Sm. 143, 52 Eng. Repr. 332; Simmons v. Henderson, 207 Ala. 692, 93 So. 624; Jones, Mortgages (8th ed.) Sec. 881; 41 C. J. 983. Counsel for the plaintiff in their brief on rehearing argue that the rule is different, if the mortgagee has gone into possession, as was true in the case at bar, and they cite 41 C. J. 615, where it is stated that a "mortgagee in possession is generally regarded as a constructive trustee." It will be found, however, upon examination of the cases cited, that the statement must be understood in a limited sense. They have no bearing on a situation such as that before us except Ten Eyk v. Craig, supra, which will be referred to later. We did not specifically refer to the point of a mortgagee in possession in the original opinion. Counsel had argued that the defendant's indebtedness was paid off some time during 1934—in other words, that he then ceased to be a mortgagee. No theory such as advanced now was mentioned in their former argument, and we did not think it necessary, or it did not occur to us that it was necessary, to consider that phase of the case. A mortgagee whose indebtedness has been paid ceases to be a mortgagee, and hence, if he has possession he ceases, in a sense at least, to be a mortgagee in possession. However, we find it stated in Hubbell v. Moulson, 53 N. Y. 225, 229, that "in the absence of an agreement

between the parties there is no legal satisfaction of the mortgage by the receipts of rents and profits by a mortgagee in possession to an amount sufficient to satisfy it, and his character as mortgagee in possession is not divested until they are applied by the judgment of the court in satisfaction of the mortgage." We need not decide whether that is a correct statement, and shall assume that for some purposes at least the defendant in this case may be considered as still a mortgagee in possession, though his mortgage was paid, and shall inquire whether or not the fact of possession makes any difference in the conclusions which should be reached herein. We think not. Parties may, of course, by contract enlarge the duties of a mortgagee who goes into possession. But that is not the situation herein. It is difficult to see that if a mortgagee who is not in possession may purchase a prior lien, or the property under a sale thereunder, why he should be deprived of these rights by the mere fact of going into possession. We can not think of any consideration, legal or equitable, which would require the application of a different rule of law. A mortgagee who goes into possession does so not for the purpose of entering into any fiduciary relation with the mortgagor, but for the purpose of collecting his debt. Their interests are antagonistic; they clash. Of course, when the mortgagee takes possession, he takes upon himself certain responsibilities which he would not have otherwise—e.g., not to commit waste, to collect the rents—and so, in a limited sense, may be considered a trustee, but no good reason is perceived why he should be considered as such for the purpose of depriving him of the rights above mentioned which he had previously. The exact point was discussed and considered at great length in the case of Ten Eyk v. Craig, 62 N. Y. 406, where the court held contrary to the contention of plaintiff herein. The court cites Chalmondely v. Lord Clinton, 2 Jac. &

Walk. 183, 37 Eng. Reprint 527, 593, and Kirkwood v. Thompson, 2 D. G. J. & S. 613, 46 Eng. Reprint. 513. In the first of these cases the court stated that "no trust is expressed in the contract; it is only raised by implication in subordination to the main purpose of it; and after that is fully satisfied its primary character is not fiduciary. * * * The mortgagee when he takes possession is not acting as a trustee, but independently and adversely for his own benefit." In the latter of these cases the court stated that taking possession would make no difference in the relation of the parties; that "being in possession could only make a difference if it created an obligation between the mortgagee and mortgagor, which would not have existed if he had not been in possession. Nothing of this sort is suggested; no duty arises on being in possession except to account in a way onerous to the mortgagee." To the same effect see Duval v. P. & M. Bank, 10 Ala. 636; King v. Insurance Company, 7 Cush. 1. We do not feel, either on the grounds of public policy or change of conditions since the time of these decisions, that we would be justified in departing from the rule there announced. It is approved in Jones on Mortgages (8th ed.) Sec. 881, and no cases to the contrary are found.

Counsel object to our statement in the original opinion that the defendant should receive reasonable compensation for looking after the property. We are aware, of course, that the courts are not in entire harmony on that point. 41 C. J. 616; 19 R. C. L. 336. A mortgagee in possession looks, it is true, after his own interest when he collects rents. But he does so ordinarily in a manner entirely different from that contemplated by the parties. The mortgagor promises to pay. Possession by the mortgagee is taken, ordinarily, only as a last resort, and not because the mortgagee wishes to do so, but to protect himself "in a way oner-

ous" to him, and rendered onerous by the default of the mortgagor. Hence, at times at least, it would be equitable to allow him compensation. If the argument of counsel for plaintiff is true, that the defendant's indebtedness was fully paid some time during 1934, then it follows that for more than half of the time during which the defendant looked after the property, he was not acting for his own benefit, but solely for the benefit of the plaintiff. Counsel argue that the point should be left open until the facts are all known. It was not suggested in the hearing of this case that the defendant had been negligent in any way in collecting the rent. However, the facts may not all be before us, and the original opinion will, accordingly, be modified to the effect that the defendant should receive a reasonable compensation for looking after the property, unless it appears that he has been negligent or was guilty of mismanagement in looking after the property.

Counsel devote a number of pages to the statement made by us in the original opinion that the finding of the trial court that Lot 3 was included in the contract of March, 1930, by mistake was correct. Whatever may be the importance thereof, the argument is out of place. No exception was taken to this finding by the plaintiff, and it is now too late to contend the contrary. Counsel now ask that plaintiff be permitted to amend its petition so as to permit the determination in this case as to whether or not the transaction of December, 1929, was a mortgage. We do not think, however, that we should order the enlargement of the issues in the case at this time.

Other points argued in the brief for rehearing were fully discussed in our original opinion. We see no just grounds for a rehearing, and it is accordingly denied.

*Rehearing denied.*

RINER, Ch. J., and KIMBALL, J., concur.