C. M. & W. DRILLING COMPANY, INC., a corporation,

*Plaintiff and Appellant,*

vs.

EMMETT E. SCHIECK, F. B. THOMAS, P. B. MANGUS, YOUNSE BOLES and DAN BOLES,

*Defendants and Respondents,*

and

OVID McCOY,

*Defendant and Appellant.*

(No. 2658; May 24, 1955; 284 Pac. (2d) 390).

For the plaintiff and appellant, the cause was submitted upon the brief of Edward S. Halsey of Newcastle, Wyoming and A. K. Swann of Evansville, Indiana, and oral argument by Mr. Halsey.

For the defendants and respondents and Ovid McCoy, appellant, the cause was submitted upon the brief of William H. Brown, Jr., and George Apostolas of Casper, Wyoming, and Jones and Dumbrill of Newcastle, Wyoming, and oral argument by Mr. Apostolas.

## OPINION

RINER, Chief Justice.

This is a suit brought by plaintiff and appellant, the C. M. & W. Drilling Company, Inc., hereinafter usually referred to as "plaintiff" against Emmett E. Schieck, F. B. Thomas, P. B. Mangus, Younse Boles, Dan Boles, and Ovid McCoy, defendants and respondents, with the exception of Ovid McCoy who is also an appellant. It was stipulated between the parties that the same record should serve for the two appeals, viz., that of Ovid McCoy and the C. M. & W. Drilling Company, Inc.

The purpose of the suit was to impose on the defendants and each of them a constructive trust for the interest held by them in a lease given by Thomas H. Bruce and Mabel S. Bruce to Ovid McCoy and by him assigned to Emmett E. Scheick and the other defendants.

This opinion will dispose of two appeals, one by the plaintiff, the C. M. & W. Drilling Company, Inc., and the other by Ovid McCoy.

The salient facts in the case are succinctly as follows: The lands involved in said lease were: SW¼ sec. 32, T.

42 N., R. 66 W., sixth principal meridian; NW¼ sec. 5, T. 41 N., R. 66 W., sixth principal meridian. The money which paid the Bruces for the transfer of their lease came, as is shown by this record, from all the defendants except Ovid McCoy. The plaintiff advanced none of it. Ovid McCoy was rewarded by the other defendants for making the transfer of the lease to them by giving him an overriding royalty of 1 per cent.

In order to understand properly the judgment given by the court in this case, especially as against Ovid McCoy upon whom the court imposed a constructive trust as to the 1 per cent overriding royalty on the lease issued by the Bruces to Ovid McCoy and by him assigned to the other defendants, we shall refer to the testimony in part of L. S. Chism who was the president of the plaintiff corporation and who held a controlling interest in its stock.

The plaintiff was organized as a corporation under the laws of South Dakota and was brought into this State to transact business as a foreign corporation. McCoy became an employee of the plaintiff company about November 28, 1952—after the corporation aforesaid was organized. The witness, Chism, was in Scottsbluff, Nebraska, at the time McCoy went to work for the company. McCoy came to the Weston County field about January 1, 1953—before the drilling of the well on the Conner-Government lease.

"Q. Now, Mr. Chism, will you please relate the circumstances and conversations, instructions and terms of the employment of Mr. McCoy by the C. M. & W. Drilling Company? A. *Well, he was primarily hired as a toolpusher,* and he was employed as an agent of the C. M. & W. Drilling Company. He performed other duties other than a toolpusher—of borrowing equipment or loaning equipment or drilling water wells, try-

ing to get contracts and quite a number of other things like telling me about leases when people had some to lease." (A tool pusher according to Dictionary of Occupational Titles, Part I, Definitions of Titles, Department of Labor, June 1939, is defined as follows: "A Foreman. Supervises the work of Cable Drillers and Rotary Drillers and their drilling crews in the sinking of oil and gas wells.")

Chism did not have a written contract with McCoy, the contract being made in verbal form. The conversation with McCoy took place between eight and ten or eleven o'clock that night (November 28, 1952) and took about an hour. His salary started at $600 and was raised to $700 a month. (Although the witness does not remember exactly, other testimony shows that McCoy received $700 per month during his entire period of employment for the plaintiff.) The plaintiff while McCoy was in its service was engaged in drilling and developing leases. On the second or third of May, 1953, while the plaintiff was drilling the Union-Government lease, which was completed May 10, 1953, Chism told McCoy after looking over the log on the Conner well that he, Chism, would like to have McCoy try to buy the lease from the Bruces for Chism. It may be that Chism told McCoy to buy the lease for the plaintiff company; Chism does not remember whether he said the company. McCoy was employed by the plaintiff company. Chism talked to McCoy at a later date and asked him about the Bruce lease; and McCoy told him he hadn't been able to find out anything, that Mr. Bruce was in Texas on his vacation. The latter part of June or the first of July, 1953, Chism talked to McCoy over the telephone. At that time McCoy stated: *"I didn't hire out to the C. M. and W. Drilling Company as a lease broker,"* that he hired out as a tool pusher and that it wasn't any of Chism's business for him buy-

*ing the lease and for him selling to someone else.* Chism said he gave McCoy instructions to buy different things; McCoy bought several things in the way of supplies over the county. McCoy was told that he could borrow and loan equipment; he borrowed some equipment from Dan Boles and loaned other equipment to the Yellowstone Drilling Company. Chism never instructed McCoy to sell the Bruce lease to anyone and Chism did not receive any consideration which McCoy received— if he got any when he sold that lease.

Under cross-examination the witness, Chism, stated that McCoy bought a car for the plaintiff company but did not pay for it. The plaintiff paid for it. During the time McCoy worked for the plaintiff company, he never at any time had authority to write checks on the plaintiff company; he did not even have authority to write a payroll check. Chism personally negotiated for the Conner-Government lease of 320 acres.

"Q. Would you tell the Court please, Mr. Chism, the location of lands or the names of lessors that Mr. McCoy acquired for your company? A. He was only instructed to acquire one lease.

"Q. Have you read the petition filed in this case by your company? A. I have not.

"Q. *Let me ask you this: What information did you give Mr. McCoy about the Bruce Lease, the subject of this lawsuit? A. I didn't give him any information.*

"Q. *You did not? A. No.*

"Q. There was nothing of a confidential nature that passed between you? A. *I don't know of anything confidential, no.* * * *

"Q. My question was, Mr. Chism, whether or not it is a mistake that in this petition it is said that McCoy

in taking the Bruce Lease was acting upon information given to him by the plaintiff when you have just testified that you gave him no information about the Bruce Lease at all. A. The information was that I told him that I wanted the lease and that was information enough—to go buy it for the company. I didn't break down the information.

"Q. You didn't give him any, did you? A. *I didn't think it was necessary to.* He was an employee of the company, and I wanted the lease. * * *

"Q. Did anybody except yourself in the company give Mr. McCoy any information? A. No."

It is a fact that Chism hired McCoy by telephone, McCoy being in Newcastle when he, Chism, called.

"Q. Is not the occupation shown on the same page from your records under the classification written 'toolpusher?' A. That is right, yes.

"Q. Do these other pages—the next two pages which you have produced—show the payroll record of Mr. McCoy with your company? A. That is right.

"Q. Is not the occupation shown on each of those sheets that of 'toolpusher?' A. Yes, sir.

"Q. And the salary continues at the rate of $700.00? A. Yes. * * *

"Q. He started at $700.00 a month and finished at $700.00 a month, didn't he? A. Yes, he was in our employ about six or seven months.

"Q. During that time, he was continually classified by your company, the C. M. and W. Drilling Company, on your records as a 'toolpusher?' A. That's the timekeeper's record. He was classified as a 'Drilling Superintendent.'

"Q. Where? A. I don't have to write it down on a record to classify him as a 'Drilling Superintendent.'
* * *

"Q. Let me ask another question about the records you have produced. From whom did you get the information about Mr. McCoy's classification shown on these pages. Did the information come from you or Mr. McCoy? A. I got them from the company record. When Mr. McCoy went to work for the company, he was classified as a 'toolpusher', but he had other and increased things that he was doing.

"Q. Alright, I'd like to have you testify to the names of any persons with whom Mr. McCoy deals for the C. M. and W. Drilling company in negotiating leases for your company. A. Well, I wouldn't know as he dealt with anybody. * * *

"Q. Have you not read a copy of the company's petition? A. I have not.

"Q. You have not. I direct your attention to paragraph numbered eight of the C. M. and W. Drilling Company's petition in which it is said: 'That on and prior to the 28th day of May, 1953, the defendants P. B. Mangus, F. B. Thomas, Emmett E. Schieck, Younse Boles and Dan Boles, all, and each of them, knew that the said defendant Ovid McCoy was the agent of and was employed by and was in the employ of the plaintiff, engaged in performing services for the plaintiff in the business of acquiring, drilling and development of oil and gas leases.' Now, let me ask you with respect to that; what was the knowledge that might be given to P. B. Mangus or any of them that Mr. McCoy was assisting your company in acquiring any lease? A. I didn't give them any. * * *

"Q. He (Younse Boles) knew he was your toolpusher, didn't he? A. He knew McCoy was engaged in anything

I might give him. I didn't have to explain what Mr. McCoy's duties were to anyone. They had knowledge he was an employee of the C. M. and W. Drilling Company.

"Q. How did they know, in accordance with the charge made in the plaintiff's petition, that McCoy had anything to do with getting leases for your company? A. I suppose that they knew that. They knew that anyone employed with the company would naturally be employed to do most anything.

"Q. No matter what his training or qualifications were? A. That is right. * * *

"Q. What did you tell McCoy in regard to the Bruce Leases? A. I told McCoy to get the description.
"Q. That's were it rests now? A. Yes.

"Q. But McCoy's business is not buying leases? A. No. * * *

"Q. Did you contact Mr. and Mrs. Bruce to acquire this lease at any time? A. I don't remember whether I did or not. It seems to me I talked to his son when I was drilling that Conner well. I don't know whether that specific lease was mentioned or not. * * *

"Q. The Conner well was plugged as a dry hole? A. That is right. * * *

"Q. Tell me who else you asked Mr. McCoy to contact other than Mr. and Mrs. Bruce. A. That's the only one, I think.

"Q. *That's the only one in all the time he worked for the company? A. Yes, sir.*

"Q. *Never at any other time was he asked to contact anybody about leases?* A. The company is rather small. We had to buy as we could. We only bought what leases

we could afford and what we thought might be all right.

"Q. What kind of a guide did you give McCoy as a basis of negotiation; what kind of value? A. *I didn't give him any guide.*

"Q. You didn't? A. I told him to try to buy the lease, and I supposed that he would purchase a lease or make negotiations and tell the company what it was. * * *

"Q. Did any other agent at your personal direction on behalf of the company try to negotiate a lease on that land? A. *No, I don't know of any agent. I never hired any agent.*

"Q. *There was no other broker or agent who represented you?* A. *Not that I know of.* I had the bank at Upton call Mr. Bruce on different tracts of land. * * *

"Q. And you gave him (McCoy) instructions on each occasion? A. He had the instructions when he went to work for the company, and he bought the stuff as he saw fit and where and when. He hired the trucks to move his equipment around, hired his men, disposed of his men and negotiated for cement; anything that pertained to the development of the leases, running pipe.

"Q. All the things you have just testified to are common things for a toolpusher to do in the industry? A. Toolpusher does some of it, drilling superintendent does some of it, and the production superintendent does some of it. * * *

"Q. Did you advise Mr. McCoy why you terminated his employment in June( 1953? A. I did not. * * *

"Q. Did Mr. McCoy have any authority from the C. M. and W. Drilling Company to write checks for any purchases? A. I answered that once. I said 'no.' * * *

"Q. Mr. Chism, I would like to clarify, if I may,

by a question or two this situation: Did I understand your answer to be when I asked you if McCoy was employed by you over the telephone that your answer was 'yes, he was'? A. Yes.

"Q. Mr. McCoy was in Newcastle at the time you employed him? A. Yes, I am sure he was in Newcastle, and I asked him if he would like to go to work for the company, and if he did to report to Scottsbluff, Nebraska, and I would pay his expenses down there. * * *

"Q. *Who called on your company to sell the land in question? A. No one.*

"Q. Where did you get the information? A. I drilled close by this Bruce land. * * *

"Q. Did you give Mr. McCoy any authority to bind the C. M. and W. Drilling Company to a lease agreement with Mr. and Mrs. Bruce on their land? A. I gave Mr. McCoy instructions to buy it for the C. M. and W. Drilling Company and anything that we've ever attempted to buy or negotiate we have never failed to follow through and make the deal.

"Q. You gave him no instructions on what to pay for it? A. I told him to try to buy the lease.

"Q. That was all? A. Yes, sir.

"Q. You didn't tell him anything about limits? A. Well, I suppose he came back with the limit. I didn't mention limits, but I certainly have the right of refusal if the limits were too high or exceeded the amount of company cash at that time.

"Q. *You gave him funds to buy the lease?* A. I didn't deem it necessary.

"Q. * * * or any authority to write checks or

any check? A. I never gave him authority to write checks. I don't think it proper to have him write checks.

"Q. Now in previous testimony you say that he bought 'other things which he bought' and you always provided the money? A. I credited it.

"Q. *You are talking about drilling supplies? A. Yes.* * * *

"Q. After he contacted you and you approved the deal he was permitted to buy the car? A. That is right.

"Q. There never was a time when he bought a lease that you or the company paid for? A. *Never was a time, yes, sir.* * * *

"Q. When, Mr. Chism, did the C. M. and W. Drilling Company make any demand on Emmett E. Schieck for the reassignment of this Bruce lease? A. None that I know of.

"Q. You never did? A. No, sir.

"Q. You know that it is charged in the petition of the plaintiff that a demand had been made? A. I never read the petition, but I only made a demand on Mr. McCoy because I had no other dealings with anyone else. * * *

"Q. Did you make any demand on Younse Boles to reassign the lease? A. I *certainly did not.*

"Q. Did you make any demand on the other defendants? A. *I didn't no.* * * *

"Q. And no demand was made for the plaintiff company on any of the defendants? A. Name the defendants.

"Q. Ovid McCoy? A. It was made on McCoy. * * *

"Q. When was this demand made? A. The demand

was made the latter part of June or the first of July.

"Q. Of 1953? A. That's when I called Mr. McCoy at Sheridan, Wyoming, and he informed me that he had sold the lease and that he hired out only as a toolpusher, and didn't hire out as a lease broker.

"Q. Isn't it a fact that he informed you in that telephone conversation of July 1953 that he bought the lease with Emmett Schieck and his group with Emmett Schieck's money? A. He didn't tell me that.

"Q. Did you ask him that? A. I didn't make any inquiry of it. I didn't see the necessity of asking where he got the money.

"Q. Did you ask him whose money it was? A. No, he told me that he had bought the lease and sold it and that it wasn't any of my business.

"Q. Did he not say that he had bought it and was only earning a one percent overriding royalty? A. He told me specifically that he had bought the lease and had sold it.

"Q. That was over the telephone? A. That is right.
*   *   *

"Q. To your knowledge, is there any place in the minutes of the corporation a record of any authorization for any employee to negotiate leases for the company? A. *I wouldn't think there would be.*

"Q. You know there isn't don't you? A. *I'm pretty sure there isn't,* but I would have to read the minutes.
*   *   *

"Q. Is there any other person besides yourself and Dr. Williams authorized to negotiate for leases for the company? A. Yes.

"Q. Who else? A. Any of the stockholders are not authorized. It is not authorized in the minutes.

"Q. You and Dr. Williams are authorized to negotiate for leases? A. I am authorized.

"Q. You personally? A. Yes.  *  *  *

"Q. Did the two of you, you and Dr. Williams, own the controlling stock? A. I owned them myself.

"Q. You owned them personally? A. Yes, sir.  *  *  *

"Q. The C. M. and W. Drilling Company, the plaintiff corporation, is the only corporation that has been referred to in which you have an interest? A. That is right."

(Significant quotations from the testimony above-quoted have been italicized.)

On this testimony and that of other witnesses of similar character, the court entered the following judgment:

"The above-entitled case having come on for trial before the Court without a jury on the 12th day of January 1954, the Plaintiff being present in Court by its officers and its attorneys of record herein, and the Defendants appearing either in person or by their attorneys of record herein, and the parties having announced themselves ready for trial, and the Plaintiff having presented evidence in support of the allegations of its petition and having rested, thereupon the Defendants jointly and individually moved the Court for judgment against the Plaintiff and in favor of the Defendants upon the specific grounds and for the reasons set forth in the record including, among other grounds, a failure to prove facts sufficient to warrant the granting of relief against the Defendants, and the Court having heard the arguments of counsel and being fully advised did thereupon determine that the motion of Defendants should be sustained as to all of the Defendants except the Defendant, Ovid McCoy, whereupon the trial proceeded with respect to the issues remaining in the case between the Plaintiff and the Defendant, Ovid McCoy, and said Defendant having

offered evidence in support of his defense, and the Plaintiff having offered rebuttal evidence, and the Court being now fully advised, finds as follows:

"1.  The Defendants, Emmett E. Schieck, F. B. Thomas, P. B. Mangus, Younse Boles, and Dan Boles, are entitled to judgment upon the order of this Court sustaining the motion of said Defendants for judgment against the Plaintiff on the grounds previously stated and shown by the records, at the close of Plaintiff's evidence.

"2.  Generally in favor of the Plaintiff and against the Defendant, Ovid McCoy.

"3.  That the interest of Ovid MccCoy in and to the oil and gas lease which is the subject of this case, being an overriding royalty of one percent (1%) of the value at the time of production of all of the oil, gas and other hydrocarbon substances produced, saved and marketed from said lands, should be conveyed by said Defendant to the Plaintiff.

"WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

"That the Defendant, Ovid McCoy, shall, within twenty (20) days after entry of this judgment, execute, acknowledge and deliver to Plaintiff an assignment, in the customary form, transferring to Plaintiff the one percent (1%) overriding royalty owned of record by said Ovid McCoy in and to the oil and gas that may be produced, saved and marketed from the lands described as the Southwest Quarter (SW¼) of Section 32, Township 42 North, Range 66 West of the 6th P.M., and the Northwest Quarter (NW¼) of Section 5 in Township 41 North, Range 66 West of the 6th P.M. pursuant to that certain oil and gas lease which is of record in the chain of title to said property dated May 18, 1953, from Thomas N. Bruce and wife to Ovid McCoy; to which the said Defendant, Ovid McCoy, excepted, and exception is hereby allowed.

"IT IS FURTHER HEREBY ORDERED, ADJUDGED AND DECREED, that the Defendants, Emmett E. Schieck, F. B. Thomas, P. B. Mangus, Younse Boles,

and Dan Boles, be and they are hereby given judgment against the Plaintiff and in favor of said Defendants on the basis of the motion made by said individual Defendants at the close of Plaintiff's evidence, that the said Defendants are the owners of said oil and gas lease free from the claims of every nature and kind of the Plaintiff, and that the cloud upon the title of said Defendants to said oil and gas lease resulting from the claims of the Plaintiff with respect thereto be and the same is hereby removed, and the title of said Defendants to said oil and gas lease be and it is hereby quieted as against the claims of Plaintiff, and said Plaintiff be and it is hereby permanently enjoined and restrained from claiming or asserting any right, title or interest whatsoever in and to said oil and gas lease or the oil and gas produced from the lands embraced therein, save and except to the extent of the one percent (1%) overriding royalty interest hereinabove described which is to be transferred by said Defendant, Ovid McCoy, to said Plaintiff.

"The parties hereto having agreed in open Court that each would pay the costs incurred by the respective parties hereto, no award or allowance of costs is made herein.

"Plaintiff at the time excepted to the Order in open Court sustaining the motion of all of the Defendants except Ovid McCoy for judgment in favor of said Defendants at the close of Plaintiff's case, and also excepted to the portions of this judgment adverse to said Plaintiff, which exception is hereby allowed."

Generally speaking, an agent in the restricted and proper sense is a representative of his principal in business or contractual relations with third persons, while an employee is one engaged not in creating contractual obligations but in rendering service, chiefly with reference to things, but sometimes with reference to persons when no contractual obligation is to result. 14 Words and Phrases 541.

It will be observed from the foregoing excerpts from Chism's testimony that Ovid McCoy was employed

primarily as a tool pusher. He was not employed as a lease broker or a person whose business it was to obtain leases for the plaintiff. Chism expressly says that McCoy was never an agent of his. The fact that McCoy was serving as an employee, viz., a tool pusher with its attendant duties as delineated in Chism's testimony hardly gave the plaintiff the right to establish a constructive trust relative to duties that McCoy never understood he was to assume. 89 C.J.S. 1023, 1024, in discussing the subject of constructive trusts, says:

"So, a constructive trust ordinarily cannot grow out of the mere violation of a declaration or agreement of trust, whether implied or express, written or verbal, or from a violation of, or refusal to, perform a promise to, or agreement with, the person seeking to establish the trust to convey property to him  *   *   *."

It is significant that McCoy was never authorized to draw any checks whatsoever in aid of transactions for the company. Plaintiff furnished him no money or funds with which to buy the Bruce lease. The defendants other than McCoy did furnish the funds and when McCoy obtained the Bruce lease for the other defendants, we fail to see why he should not retain the overriding royalty of 1 per cent which the other defendants tendered him while the plaintiff seeks to take that overriding royalty away from him without having done anything that we can see which would make it inequitable for McCoy to retain the overriding interest. The text last cited also says at page 1069 "  *   *   *

that a constructive trust cannot be established merely on a broken promise to purchase, or to negotiate the purchase of, as agent, property for another, where there is no positive fraud perpetrated other than the breach of the promise."

In Carkonen v. Alberts, 196 Wash. 575, 83 P. 2d 899, 913, 914, 135 A.L.R. 209, the court used this language:

"While the breach of a mere verbal promise to purchase and convey land or negotiate as agent for the purchase of that land for a principal is a moral wrong, such breach is not a legal fraud, and standing alone is not a sufficient basis upon which to establish a constructive trust or a trust ex maleficio. We quote as apt, with reference to the conflict among the cases on the question presented, the following language from Farrell v. Mentzer, 102 Wash. 629, 174 P. 482: 'By no honest process of reasoning can the different decisions be harmonized or reconciled, and by no sophisticated reasoning should it be attempted to be done. * * *

The statute of frauds is not an equitable doctrine, but is an absolute statute * * *. It may be that a strict application of the statute in some cases will operate to defeat a just claim, but that is not a sufficient reason for attempting to remove those cases from the operation of the statutes.' "

In support of this view Pomeroy's Equity Jurisprudence was quoted to the following effect:

" ' "The foregoing cases should be carefully distinguished from those in which there is a *mere* verbal promise to purchase and convey land. In order that the doctrine of trusts ex maleficio with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however, unequivocal; otherwise the statute of frauds would be virtually abrogated; *there must be an element of positive fraud accompanying the promise,* and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in face of the statute; it endeavors to prevent and punish fraud, by taking from the wrongdoer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts." 3 Pomeroy's, Equity Jurisprudence (3d Ed.), § 1056.' "

See also 1 Perry, Trusts and Trustees (7th ed.), § 206, p. 361. In this connection, we may recall that 12 R.C.L. 254, 255, 256, states:

" * * * the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise, or an agreement to do something at a future time, or to make good subsequent conditions which have been assured. Nor, it is held, is such nonperformance alone even evidence of fraud. Reasons given for this rule are that a mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made. The failure to make it good is merely a breach of contract, which must be enforced by an action on the contract, if at all. And as in the case of promises, it is generally held that mere assertions of intention, or declarations of future purpose, do not amount to fraud."

In Collins v. Sullivan, 135 Mass. 461, 462, the court used this language:

"The plaintiff relies on the two grounds of agency and fraud. With regard to the former, it might perhaps be enough to cite such cases as *Fickett* v. *Durham,* 109 Mass. 419, and *Barnard* v. *Jewett,* 97 Mass. 87, and the proposition laid down by Lord St. Leonards, and approved by this court in *Kendall* v. *Mann,* 11 Allen, 15, 17: 'Where a man merely employs another person by parol, as an agent to buy an estate, who buys it for himself and denies the trust, and no part of the purchase money is paid by the principal, and there is no written agreement, he cannot compel the agent to convey the estate to him, as that would be directly in the teeth of the statute of frauds.' Sugd. Vend. & Pur. (14th ed.) 703."

It is interesting to note that the opinion in the case was delivered by Mr. Justice Holmes, at that time a member of the Supreme Judicial Court of Massachusetts. There it appeared that the defendant bought land on his own behalf and with his own money and took a conveyance of it to himself. This was not enough to establish a

case of fraud so that a constructive trust could be imposed.

This court in discussing this subject of constructive trusts has already pointed out in Carpenter & Carpenter v. Kingham, 56 Wyo. 314, 348, 349, 109 P. 2d 463, 476, 110 P. 2d 824, that:

" 'While such trust may be established by parol testimony, the proof must be clear and convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion.' 3 Bogert on Trusts and Trustees, § 472, states: 'As with the proof of express and resulting trusts, so in the case of the establishment of constructive trusts, the courts have announced that they require "clear and convincing" evidence. Other judicial expressions are even stronger in their demands. "If the evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust, it is not sufficient to support a decree declaring and enforcing the trust." Sometimes the requirement is stated to be that the facts leading to the decree establishing the constructive trust must be proved "by greater weight than the mere preponderance of the evidence" or beyond a reasonable doubt. These statements reflect judicial caution in accepting oral evidence which is intended to contradict absolute conveyances in deeds and wills and overturn record titles.'

"Moreover, a mere promise, without more, to protect any interest which the plaintiff had would not, at least in the absence of confidential relationship, as here, be sufficient to make the defendant a constructive trustee. In order that the doctrine of trust ex malificio with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal; *there must be an element of positive fraud accompanying the promise and by means of which the acquisition of the legal title is wrongfully consummated.*" (Italics supplied.)

A careful examination of the voluminous record in this case has convinced us that the District Court of Weston County overlooked what was said in 56 Wyo-

ming above-quoted. It results, therefore, as we see it that the judgment in favor of the defendants except Ovid McCoy should be affirmed and the judgment rendered against Ovid McCoy for the overriding royalty of 1 per cent should be reversed.

*Affirmed in part and reversed in part.*

BLUME, J., and HARNSBERGER, J., concur.